BEFORE THE UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: |
| | ) | |
| VANDERBILT UNIVERSITY, | ) | |
| MARY HELEN SOLOMON, and | ) | |
| CARA TUTTLE BELL, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT SUBSTITUTED FOR
## ORIGINAL COMPLAINT

Plaintiff John Doe, for his complaint against defendant Vanderbilt University, alleges as follows:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has subject matter jurisdiction over plaintiff's state claims under 28 U.S.C §§ 1367 and 1651. The amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, an actual controversy exists between Plaintiff and Vanderbilt University, justiciable in character, in respect to which John Doe seeks a declaration of his rights and appropriate further relief under the provisions of 28 U.S.C. §§§ 2201, 2202 and 1651.

2. This Court has personal jurisdiction over defendant Vanderbilt University because it regularly does business and engages in other persistent courses of conduct in this district.

3.       Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendant

Vanderbilt University is located in this district and a substantial part of the events

giving rise to this claim occurred in this district.

**PARTIES**

4.       Plaintiff John Doe is a resident of Mumbai, India, and is a citizen of the United

States.

5.       Defendant Vanderbilt University ("Hereinafter "Vanderbilt") is a private

university, located in Nashville, Davidson County, Tennessee, which accepts

federal funding.

6.       Upon information and belief, Defendant Mary Helen Solomon is a resident of

Davidson County, TN.

7.       Upon information and belief, Defendant Cara Tuttle Bell is a resident of Davidson

County, TN.

**FACTS**

8.       On February 10, 2017, Jane Roe, a female Vanderbilt student, reported

sexual misconduct to undergraduate resident advisor J.C.

9.       On February 10, 2017, J.C. (male undergraduate), a resident adviser, submitted an

incident reporting form regarding a report of sexual misconduct made to him by

Jane Roe That same day, G.L. Black, Associate Dean of Students, Community

Standards and Student Support, referred this matter to the Equal Opportunity,

Affirmative Action, and Disabilities Services Department (hereinafter EAD). On

February 13, 2017, Cara Tuttle Bell, Director, Project Safe, also referred this

matter to EAD.

2

10.     On March 31, 2017, Vanderbilt, through its agent Mary Helen Solomon, Director of the Office of Student Accountability, Community Standards, & Academic Integrity, charged John Doe with sexual assault-intercourse, sexual assault-contact, and dating violence, as the result of the complaint filed by Jane Roe

11.     John Doe indicated on the charge sheet that he disagreed with the charge.

12.     John Doe was a sophomore living in Branscomb Hall at the time the complaint arose.

13.     Upon information and belief, Jane Roe was also a sophomore.

14.     Doe had a 3.0 GPA, was majoring in economics and history, and minoring in financial economics and corporate strategy.

15.     Doe was the recruitment chair for his fraternity, and was a club rugby player until he injured his hand.

16.     Doe chose Vanderbilt because of the high level of education it offers, and because of its academic prestige.

17.     Doe aspires to finish his Bachelor's degree in the U.S., and then to a career in Finance.

18.     EAD conducted interviews of Jane Roe on March 1, 2017, March 21, 2017, and July 6, 2017. Jane Roe Attended all interviews with her advisor.

19.     EAD conducted interviews of John Doe on April 27, 2017, and August 2, 2017 (via telephone). John Doe did not have an advisor present at either interview.

20.     The EAD investigation concluded that Jane Roe and John Doe met in Piranha's, a bar in downtown Nashville, the evening of February 9, 2017.

3

21.     Both individuals told EAD they had been drinking in their rooms or at other venues prior to going to the bar.

22.     At Piranhas, Jane Roe approached John Doe and began dancing with him and kissing him.

23.     John Doe did not drink anything alcoholic at Piranha's, and he did not see Jane Roe drink anything while there.

24.     John Doe and Jane Roe got a ride, presumably an Uber, back to Doe's residence in Branscomb Hall. They disagree on the details, but they kissed and Jane Roe groped his crotch during the car ride.

25.     John Doe had "zero doubt" that Jane Roe wanted to have sex based on how forward she had been with him.

26.     Jane Roe told EAD that when they arrived at Branscomb Hall, she was "expecting to hook up with him," which she was "fine with."

27.     In the elevator, en route to Doe's room, he pressed her against the wall and groped and kissed her. She grabbed his buttocks and pulled him into the kiss. Video and Audio recorded Jane Roe saying "No, you're fine" and "Yeah, I do." as they exited the elevator.

28.     During her third EAD interview, Jane Roe stated that things that happened that night might have implied consent.

29.     Jane Roe voluntarily entered Doe's room, and voluntarily undressed herself therein, making statements like "oops, my pants fell off," and "oops, my dress fell off."

4

30.    Doe and Jane Roe proceeded to engage in kissing and petting. Doe performed oral sex on Jane Roe and had vaginal sex with her in the missionary position. She was an active participant.

31.    Although Doe's and Jane Roe's accounts differ significantly, they agree that Doe pushed her up against the wall, put his hands on her neck, they bit each other's necks, he digitally penetrated her anally and orally, and that she performed oral sex on him.

32.    Jane Roe says that the anal penetration was not consensual, but that she did not communicate anything to Doe to indicate that it was unwelcome.

33.    The "rough" sex left marks and bruises on Jane Roe's body. Jane Roe left a hickie on Doe's body.

34.    Jane Roe stated to EAD that she does not believe that she explicitly said anything to tell Doe that she did not consent, and therefore, "this may have seemed OK to [Doe]."

35.    After leaving Doe's residence, Jane Roe went to her own residence without assistance. She took pictures of the marks on her body, and discussed the incident with friends and acquaintances.

36.    Jane Roe went to the ER later that afternoon (February 10) as the result of the alleged "sexual assault."

37.    On or about February 17, Jane Roe moved from her residence hall to Kissam, because being in Branscomb Hall was "triggering."

38.    In its Findings of Fact, EAD concluded, based on the preponderance of the evidence, and taking all of the evidence into account, "that if Jane Roe was intoxicated

5

to the point of incapacitation, [Doe] did not know and/or reasonably would not have known that she was incapacitated."

39. In its Findings of Fact, EAD then concludes that "from the point at which [Doe] choked Jane Roe, the incident became nonconsensual.

40. The EAD concluded that [Doe] engaged in sexual assault – intercourse, sexual assault – contact, and dating violence in violation of the 2016-2017 Sexual Misconduct and Intimate Partner Violence Policy.

41. On or about October 10, 2017, Vanderbilt released its investigative report and its findings to both parties.

42. On or about October 25, 2017, Vanderbilt informed Doe that his sanction for the alleged violations would be expulsion from the University.

43. On or about November 3, 2017, Doe appealed his expulsion through Vanderbilt's appeal process.

44. On or about December 4, 2017, Doe emailed chancellor Zeppos a passionate and detailed plea to reverse his expulsion.

45. On or about December 6, 2018, Doe is advised that his appeal has been sent to the appropriate committee.

46. On or about the morning of January 17, 2018, someone from Vanderbilt Housing woke Doe to inform him that his appeal had been unsuccessful and to escort him to Accountability.

47. At Accountability, Doe informed Mary Helen Solomon that he was suicidal.

48. Ms. Solomon told Doe that she was either going to call the police, or he was going to accompany her to the student counseling center.

6

49. The Student Counseling Center determined that Doe was a suicide risk and involuntarily committed him to a mental health facility.

50. Prior to admission, and right before Vanderbilt took his posessions (including his phone), Doe called a male friend to let him know what was happening.

51. Doe was admitted to the facility the same day.

52. At no time between the evening of February 9, 2017, and Doe's admission to the mental health facility on January 17, 2018, did Vanderbilt contact Doe's parents to inform them of anything that was happening.

53. Doe's parents were ultimately notified of the situation by Doe's girlfriend.

54. Doe's father immediately flew to the States to help Doe during his hospital stay, to find a lawyer, and to deal with other aspects of the situation.

55. Doe was ultimately institutionalized for five nights. His father checked him out of the hospital.

56. On or about date, Doe returned to India, where he remains.

57. Doe missed the application deadlines to apply to other American universities for the spring and fall 2018 semesters. He will begin applying for the Spring 2019 semester.

58. As of the date of filing, Doe has applied to, but has not been accepted by, any American university.

59. Doe's expulsion will make it particularly difficult for him to pursue a career in finance. The stress on his grades during the investigation process hampered his ability to find a finance internship prior to his expulsion.

**COUNT I**
**BREACH OF CONTRACT**

60. All of the foregoing paragraphs are incorporated by reference.

61. John Doe applied to and enrolled in the University and paid tuition and other fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the University would provide education and instruction to Doe as well as abstain from arbitrarily imposing punishment that would prevent Doe from securing his degree, or that interfered with his education, in an unfounded manner or on an arbitrary basis.

62. Doe also had the reasonable expectation that Defendant Vanderbilt would implement and enforce the promises and policies made in its official publications, including the Student Handbook 2017/2018 and all other official publications of the university.

63. A contract was formed between the Vanderbilt University and Doe; either an express contract or a contract implied in law or in fact.

64. The contract contained an implied covenant of good faith and fair dealing and incorporated other specific written provisions from the Student Handbook 2017/2018 and other unwritten rights guaranteed by law. Certain rights were and are guaranteed to every student at Vanderbilt involved in the disciplinary process, including those accused of sexual misconduct or assault.

65. Specifically, Defendant Vanderbilt University is accused of the following breaches:

**A.      Breach of the obligation to conduct an appropriate and unbiased investigation;**

66. Vanderbilt's sexual misconduct policy does not discuss or establish the responsibility of any employee or investigator, including the Title IX coordinator and members of the EAD, to act impartially or without bias.

8

67. Despite the lack of any language regarding impartiality in Vanderbilt's sexual misconduct policy, the promise of fundamental fairness and the implied covenant of good faith require Vanderbilt University to conduct appropriate and unbiased investigations into all sexual misconduct allegations.

68. Vanderbilt University failed to conduct an appropriate and unbiased investigation regarding the allegations against Doe.

69. EAD communications with Doe make it clear that the office was biased against him from the very start of the investigation.

70. In some instances, the Final Investigative Report indicates that a particular occurrence is a "fact" merely because the complainant stated that it was so.

71. In no instance did the Final Investigative Report indicate that a particular occurrence was a "fact" because the respondent said that it was so.

72. The EAD found "that if Jane Roe was intoxicated to the point of incapacitation, [Doe] did not know and/or reasonably would not have known that she was incapacitated." This finding is supported by six sub-points. Nonetheless, the university still found Doe "responsible."

**B.      Denial of meaningful right to counsel;**

73. Vanderbilt's sexual misconduct policy states that Doe was entitled to a support advisor of his choosing, and had the right to select an attorney or legal counsel as his support advisor.

74. Vanderbilt violated both its own sexual misconduct policy, the promise of fundamental fairness, and the implied covenant of good faith and fair dealing by

9

denying Doe a meaningful right to effective counsel at critical times throughout the investigation and disciplinary process.

75. Doe was not afforded the right to have an attorney-advisor, as the Student Handbook expressly limits advisors to "Vanderbilt faculty, staff, or student adviser…. *Who has not had formal legal training."*

76. The Student Handbook provides that "The adviser for either party may confer privately with that party… but… may not speak on behalf of the complainant or respondent or otherwise participate in any meeting."

77. The notion of a student being able to defend himself competently in the immensely emotional situation Doe found himself is absurd. Doe was intimidated, as any innocent student accused of sexual assault would have been, and could not have been expected to prepare and deliver his version of the facts in a coherent and logical manner. Doe should not have been forced to go through the investigation process without counsel, and a non-attorney advisor who is not permitted to participate is no substitute for effective legal counsel.

**C.     Breach of the obligation to provide Doe with the specific charges against him;**

78. Vanderbilt University's sexual misconduct policy requires that notice be provided to students accused of sexual assault.

79. The notice provided to Doe contained only information regarding Jane Roe's allegations of sexual misconduct.

80. The notice provided by Vanderbilt University was defective in that it did not fairly apprise Doe of the range of charges which he was facing.

10

81. Complete and meaningful notice of the charges faced by an accused individual is among the most basic procedural protections, and the notice must state and define the charged offenses with sufficient particularity to enable the accused party to adequately defend against such charges.

82. Vanderbilt University's inadequate notice of charges against Doe was a breach of Doe's right to provided with notice of the charges against him, as well as a breach of the University's promise of fundamental fairness and the implied covenant of good faith and fair dealing.

**D.    Breach of obligation to provide competent, trained, unbiased investigators, and decision makers;**

83. Although Vanderbilt's University's sexual misconduct policy is inexplicably devoid of an obligation that decision makers act without bias, the implied covenant of good faith and fair dealing and Vanderbilt University's promise of fundamental fairness obligated Vanderbilt University to provide Doe with unbiased, competent and trained investigators and decision makers and to ensure that the outcome of the investigation was not predetermined.

84. Damian P. Marhsall oversaw all aspects of the investigation into the allegations against Doe and made the final decision regarding his sanction, and his / her bias and conduct tainted the investigation from the beginning. This conduct includes but is not limited to Marshalls conclusion that Doe was "responsible" for sexual misconduct despite earlier concluding that *if* Jane Roe was incapacitated, Doe could not have

85. Marshall's bias against Doe is also apparent because Doe was disciplined very harshly, in fact, he was given the ultimate discipline, expulsion, despite the investigator's own conclusion that if Doe had been committing sexual misconduct, he could not have

11

known it. Vanderbilt's choice to deliver the ultimate consequence, expulsion, was plainly a product of the presumption of some sort of wrongdoing on the part of Doe, as well as the atmosphere of bias that permeated the entire disciplinary process.

86. Upon information and belief, none of the investigators or decision makers involved in Doe's case had any training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting. Thus, Vanderbilt University breached its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

**E.      Breach of obligation to afford Doe an opportunity for confrontation and cross examination;**

87. Vanderbilt University's sexual misconduct policy does not provide for any sort of hearing for students accused of sexual misconduct. After an investigation takes place, the decision of guilt or innocence and the appropriate sanction(s) is left entirely up to the investigator assigned by the EAD, or the Title IX coordinator, rather than a panel of decisionmakers.

88. Doe's right to confront Vanderbilt University's evidence against him is a key component of fundamental fairness.

89. Doe's right to confront his accuser is a key component of fundamental fairness.

90. Doe's right to confront Vanerbilt University's evidence was extremely limited, as he was only permitted to review the statements of Jane Roe and other parties involved in the investigation after the investigation had concluded. He had no right to cross-examine Jane Roe or any other relevant parties.

12

**F. Breach of obligation that there be sufficient evidence (or any evidence) to support the Title IX Coordinator's finding.**

91. Pursuant to Vanderbilt University's sexual misconduct policy, the EAD could only find Doe responsible for the alleged violation based on the information in the investigatory file and utilizing the preponderance of the evidence standard.

92. Vanderbilt University's promise of fundamental fairness and the implied covenant of good faith and fair dealing require that Doe have been presumed innocent and Vanderbilt University have the burden of proof. The records pertaining to Vanderbilt University's investigation and ultimate decision demonstrate that Vanderbilt University breached these obligations.

93. Although Vanderbilt University found as fact that many parts of the sexual encounter at issue were consensual, and that if at any point it stopped being consensual Doe could not have known, it still found him responsible for misconduct that it admits there is no evidence that he could not have known he was committing.

**G. Breach of the obligation to provide a meaningful right of appeal.**

94. Pursuant to Vanderbilt University's sexual misconduct policy, Doe had the right to submit an appeal of the determination of responsibility and any sanctions because of the presence of procedural errors, new information, an argument that the evidence does not support the determination, or an argument that the severity of the sanction imposed was inappropriate.

95. Mr. Anthony Donovan, the assistant dean of student-residence life, was the Vanderbilt University employee responsible for reviewing Doe's grounds for appeal and making a determination.

13

96. Upon information and belief, the Appellate Officers who considered Doe's appeal did not have training in adjudication; in the law; in the weighing of evidence; or in the relevance of irrelevance of types of evidence in the alleged sexual misconduct investigation setting.

97. Despite the absence of any relevant training, the appellate officers were somehow able to conclude that no procedural errors, evidence of bias, relevant new information, or excessive severity had impacted or would impact the ultimate outcome and sanctions in Doe's case.

98. Upon information and belief, the Appellate Officers for Sexual Misconduct are merely a rubber-stamp for the EAD.

99. This "appeal" was illusory and a sham, and breached the promise of fundamental fairness and the implied covenant of good faith and fair dealing.

### H.     Summary

100.    All of the foregoing breaches of contract were wrongful, without justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in Doe's case.  Doe was disciplined and constructively expelled from Vanderbilt University despite being found not guilty of any sexual misconduct.  As a direct and forseeable result of these breaches of contract, Doe has sustained, and will continue to sustain, substantial injury, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

### COUNT II
### PROMISSORY ESTOPPEL

101.    All of the foregoing paragraphs are incorporated by reference.

14

102.    As described above, the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of John Doe.  In reasonable reliance on these promises and representations, Doe accepted the University's offer of admission and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

103.    To his detriment, Doe reasonably relied on the express and implied promises and representations made by the University.

104.    As a direct and foreseeable result of the University's failure to honor its promises and representations, Doe has sustained and will continue to sustain substantial injury, damages, and losses.  Doe's damages, injuries and losses include, but are not limited to: injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of future career opportunities, loss of educational and extracurricular opportunities, and deprivation of due process.

105.    John Doe reasonably believed that if he was found not guilty of the charges levied against him, he would not be sanctioned.

106.    Doe maintains that the sexual encounter at issue was entirely consensual, no evidence was presented that Doe could have known if it became non-consensual, and therefore misconduct, at some point.

107.    The EAD assisted and encouraged Jane Roe in making her allegations against Doe.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

15

108.    All of the foregoing paragraphs are incorporated by reference.

109.    Defendant Vanderbilt's actions in its investigation, including its, findings and subsequent discipline of Doe, and its decision to institutionalize a suicidal Doe without telling any parent or family member, and all actions stated in this Complaint, were done intentionally or recklessly.

110.    Defendant Vanderbilt's actions stated in this Complaint are so outrageous that they are not tolerated in a civilized society.

111.    Defendant Vanderbilt's actions regarding Doe resulted in serious mental injury.

**COUNT IV**
**NEGLIGENCE**

112.    All of the foregoing paragraphs are incorporated by reference.

113.    Having put in place a student disciplinary process, including its sexual misconduct policy, Defendant Vanderbilt University owed a duty of care to John Doe to conduct that process in a responsible way.

114.    The applicable standard of care is informed by the laws of Tennessee and by the requirements of Title IX and the Clery act.

115.    Vanderbilt University failed to perform the duty of care owed to Doe.

116.    As a direct and proximate result of Defendant's actions, Plaintiff Doe suffered actual harm.

**COUNT V**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

117.    All of the foregoing paragraphs are incorporated by reference.

118.    Defendant Vanderbilt University owed a duty of care to John Doe.

119.    Vanderbilt University failed to perform the duty of care owed to Doe.

16

120.    As a direct and proximate result of Defendant's actions, Plaintiff Doe suffered actual harm in that he became suicidal.

121.    Plaintiff suffered emotional harm, in addition to other damages.

**COUNT VI**
**GROSS NEGLIGENCE**

122.    All of the foregoing paragraphs are incorporated by reference.

123.    As set forth above, Vanderbilt University has engaged in conduct that amounts to negligence.

124.    Vanderbilt University's actions were taken with such disregard for the rights of Plaintiff that a conscious indifference to consequences is implied in law.  Vanderbilt University's actions evidence a conscious neglect of duty, a callous indifference to consequences, and such an entire want of care as would raise a presumption of a conscious indifferences to consequences.

125.    Vanderbilt University has acted willfully, intentionally, and recklessly. Vanderbilt University was reckless in that it was aware of, but consciously disregarded, a substantial and unjustifiable risk of injury or damage to Plaintiff. Vanderbilt University's disregard of this risk was a gross deviation from the standard of care.

126.    Vanderbilt University's gross negligence has caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects.

**COUNT VII**
**NEGLIGENT TRAINING AND SUPERVISION OF EMPLOYEES**

17

127.    All of the foregoing paragraphs are incorporated by reference.

128.    Damian Marshall, the Title IX Compliance Manager, was an employee of Vanderbilt University at all relevant times.

129.    Marshall, an employee of Vanderbilt University, lacked the proper training to carry out his / her responsibilities pursuant to Title IX, the Clery Act, and Vanderbilt University's sexual misconduct policy.

130.    As alleged above and below, Marshall committed negligent, grossly negligent, and intentional tortious acts that caused injury to Plaintiff.

131.    Vanderbilt University knew, or in the exercise of due care, should have known of Marshall's lack of training and inability to carry out his / her responsibilities under Title IX, the Clery Act, and Vanderbilt's own sexual misconduct policy and process.

132.    Vanderbilt University's negligent failure to train and supervise Marshall was a direct and foreseeable cause of injury to Plaintiff.  Had Vanderbilt University taken appropriate steps to train and supervise Marshall, such steps would, more probably than not, have prevented the injuries.

133.    Vanderbilt University's breach of its duty to ensure proper training and adequate supervision for Marshall proximately caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects.

**COUNT VIII**
**Declaratory Judgment- Title IX**

18

134. Plaintiffs incorporate all paragraphs above as if fully pled.

135. As set forth above, Title IX of the Education Amendments of 1972, 20 U.S.C.§§ 1681-1688, and the regulations promulgated thereunder require a school receiving federal funds to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student ... complaints" alleging any form of sexual harassment, including sexual assault.23 These procedures must "accord[] due process to both parties involved."24

136. The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

   a. "[n]otice . . . of the procedure";

   b. "[a]dequate, reliable, and impartial investigation of complaints";

   c. "the opportunity to present witnesses and other evidence"; and

   d. "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."

A school must also ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."

137. As written, the University's student disciplinary process in effect in the 2016-2017 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations, which are described above, include, but are not limited to, the following:

19

a. no requirement that an accurate audio or stenographic record be made of the hearing; and

b. the lack of a meaningful right to appeal because no record of the hearing was required and because the appeal was not as of right, but rather a request for appeal.

138.    As implemented, the University's student disciplinary process in effect during the 2016 – 2017 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable.,. Those violations, which are described above, include, but are not limited to, the following:

a. the failure to provide an unbiased disciplinary tribunal;

b. the failure to provide appropriate training for the members of the EAD and other relevant bodies; and

c. the failure to provide appropriate training for the appellate officers.

139.    As applied to John Doe, the University's student disciplinary process in effect during the 2016 - 2017 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations which are described above, include, but are not limited to, the following:

a. the failure to conduct an appropriate investigation with a trained investigator;

b. the failure to provide an unbiased disciplinary process and tribunal;

20

c. the failure to ensure that Doe be presumed innocent and that the University had the burden of proof;

d. the failure to ensure that there be sufficient evidence to support the EAD's finding;

e. the affirmance of the EAD's finding on appeal even though the appellate officers had no record of the hearing and could not conclude legitimately, impartially, or in good faith that the EAD's decision was valid; and

f. otherwise acting to achieve a predetermined result, *i.e.,* a finding that Doe committed sexual assault or some related offense.

140.    Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, John Doe is entitled to:

a. a declaratory judgment that the University's 2012-2013 student disciplinary process, including the Sexual Assault Policies and Procedures, as written, violated Title IX (including its due process requirements);

b. a declaratory judgment that the University's student disciplinary process, including the Sexual Assault Policies and Procedures, as implemented, violated Title IX (including its due process requirements);

c. a declaratory judgment that the University's student disciplinary process, including the Sexual Assault Policies and Procedures; as applied to John, violated Title IX (including its due process requirements); and

d. further necessary or proper relief.


**COUNT XII**
**Violation of Title IX -Erroneous Outcome**

141.    Plaintiffs incorporate the above paragraphs as if fully pled.

142.    Title IX, as set forth above, prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. The University receives federal funds and must comply with Title IX.

143.    A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

144.    As set forth above, the University engaged in a series of actions that ultimately resulted in the Hearing Board's erroneous finding that John Doe committed a sex offense, *i.e.,*" sexual assault – intercourse, sexual assault – contact, and dating violence." This conduct was the product of disparate treatment of John on the basis of his gender.

145.    As set forth above, there were significant evidentiary weaknesses underlying the EAD's finding, including the EAD's recognition that if Jane Roe did not consent, Doe could not have known that.

146.    In addition to the lack of evidence against Doe, there were, as set forth above, numerous procedural flaws that affected the proof, including the lack of an appropriate and unbiased investigation, and the presumption of guilt applied to Doe

147.    The erroneous outcome of the hearing, as confirmed by the equally biased appeal process, was exacerbated by the fact that the EAD admits in its final report that if Jane Roe did not consent, Doe could not have known it.

148.    The erroneous outcome of the hearing and appeal can only be explained by gender bias against males in cases involving allegations of sexual assault. This bias is reflected in the patterns of decision making by the University throughout the entire process.

149.    Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at BC, the accused student is male and the accusing student is female. The University has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX. This significant gender-based statistical disparity demonstrates the existence of discrimination. In fact, the University impermissibly presumes male students "guilty until proven innocent" based on invidious gender stereotypes.

150.    There are at least four causes for this discriminatory environment at the University. First, acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in the University's loss of federal funding. There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

151.    Second, the University officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles.

152.    Third, these ·officials also focus on what would be most expedient for the University and, in particular, avoiding publicity that could harm the University's image

23

and brand, and hinder its efforts to attract tuition-paying students. The safer course for these officials is to convict all accused male students.

153.     Fourth, the University officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of the accused male students. The University and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Sexual Assault Policies and Procedures.

154.     The University's concern is not a fair and equitable procedure in accordance with due process guarantees, but how the school will look to the outside world and the tuition-paying students that it hopes to attract.

155.     The facts of Doe's case led him to experience this invidious gender bias and discriminatory environment.

156.     Doe, based solely on his gender, suffered an erroneous outcome of the disciplinary process and the appeal. This unlawful discrimination by the University in violation of Title IX proximately caused John to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.


**COUNT VII**
**Violation of Title IX - Deliberate Indifference**

157.     Plaintiff incorporates the above paragraphs as if fully pled.

158.     On or before December 4, 2017, Chancellor Zeppos, Cara Tuttle Bell, and Mary Helen Solomon had actual notice of the University's misconduct relating to John Doe's disciplinary proceeding and the resulting affirmance on appeal.

159.     Despite this actual notice ofthe University's misconduct and the resulting harm to Doe, each of these officials named in the preceding paragraph failed and refused to take any steps to correct the misconduct and resulting harm to John even though they had the authority and obligation to institute corrective measures. This failure and refusal can only be explained by gender bias against males, as set forth above.

160.     John, based solely on his gender, has suffered and continues to suffer the effects of the University officials' deliberate indifference. This unlawful discrimination by the University in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for this judgment against Defendant Vanderbilt University and asks this Court to:

1.     Issue a judgment that that (a) declares Vanderbilt University's investigation and prosecution of the charges against Doe to contrary to Vanderbilt University's contractual and other obligations, its own rules and regulations and arbitrary and capricious;

25

2.      Declare Vanderbilt University's student disciplinary process, including the sexual misconduct policy, as written and implemented and as applied to Doe, to be contrary to Title IX and the Clery Act;

3.      Set aside the decision of Vanderbilt University as contrary to Vanderbilt University's own rules and regulations, contrary to law, arbitrary and capricious, and unsubstantiated by evidence;

4.      Require Vanderbilt University to expunge the entire incident at issue from its records;

5.      Require Vanderbilt University's records to reflect that Doe left Vanderbilt University in good standing with no disciplinary record whatsoever and to so represent in the event of any third party inquiry;

6.      Award Doe compensatory damages in an amount to be determined at trial for mental anguish, severe emotional distress, injury to reputation, serious mental injury, past and future economic loss, deprivation of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by Defendant Vanderbilt University;

7.      Award Doe his attorneys fees, disbursements and costs pursuant to the provisions of 42 U.S.C. § 1988(b) relating to Title IX, or pursuant to any other statute or common law doctrine providing for the award of attorneys fees, disbursements, and/or costs;

8.      Award prejudgment interest;

9.      Grant such further relief that this Court may deem just and proper.

26

Dated this __20th__ of _____June_____, 2018.

                                Respectfully Submitted,

                                _____

Joyce Cooper #30855
Michelle Owens #26512
Agee Owens Cooper, LLC
110 N. Spring St. STE 100
McMinnville, TN 37110
(931) 507-1000
jcooper@ageeowenslaw.com
mowens@ageeowenslaw.com

27

## AFFIDAVIT

I, the Petitioner referred to as John Doe, after being first duly sworn, hereby make oath that I am the individual referred to as John Doe, I have read the foregoing Complaint and know the contents thereof, and, that the information in the foregoing in true and correct the best of my knowledge, information and belief.

_____
JOHN DOE

Sworn to and subscribed before me, this _____ day of _____, 20___.

In _____ (city or town), _____ (State or Province), _____ (Country)

_____
PUBLIC OFFICER

My Commission Expires:

_____

## COSTS

I do herby acknowledge myself as surety for the payment of the costs in this cause, not to exceed $1,000.00.

_____
**Agee Owens & Cooper**

28