**BEFORE THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:18-cv-00569 |
| | ) | District Judge William L. Campbell, Jr. |
| | ) | Magistrate Judge Jeffrey S. Frensley |
| VANDERBILT UNIVERSITY, | ) | |
| MARY HELEN SOLOMON, and | ) | |
| CARA TUTTLE BELL, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Comes the Plaintiff, by and through counsel, and offers this Memorandum in Opposition to Defendant's Motion to Dismiss. In summary, Plaintiff asserts that his Second Amended Complaint properly states all claims included therein.

## I.     STATEMENT OF FACTS

Title IX requires universities like Vanderbilt that receive federal funding to adopt written policies to address sexual misconduct  complaints involving students.   20 U.S.C. §§  1681-1688; U.S. Dep't of Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) (the "2001 Guidance").

Vanderbilt's Sexual Misconduct Policy prohibits "all forms of sexual misconduct, sexual assault,  sexual  harassment,  and  intimate  partner  violence,  including  dating  violence,  domestic

violence, and stalking." *Defendant's Ex. A*[1] at 106. "Dating Violence" means "sexual, psychological, or physical abuse or the threat of such abuse committed by a person who is or has been in a social relationship of a romantic or intimate nature with the person against whom the violence is perpetrated." *Id.* at 112. "'Sexual Assault – Intercourse' is any vaginal and/or anal penetration – however slight – by any body part . . . by any person upon another without effective consent." *Id.* "'Sexual Assault – Contact' is any contact of a sexual nature – however slight – with the breasts, buttocks, groin, genitals, mouth, or other body part of another, by any person upon another without effective consent." *Id.* "Effective Consent" means "consent that is informed and freely and actively given." *Id.* at 113. "Effective consent requires mutually understandable words or actions indicating a willingness to engage in mutually agreed-upon sexual activity . . . [and] must be maintained by both parties throughout the sexual interaction. Effective consent for one form of sexual activity does not constitute or imply effective consent for another form of sexual activity. Effective consent to sexual activity may be revoked at any time, at which point sexual activity must cease immediately." *Id.*

The Policy also establishes procedures for investigating sexual misconduct. The procedures in place during the 2016-2017 academic year were as follows: Complaints were referred to the Equal Opportunity, Affirmative Action, and Disabilities Services office ("EAD"). *Id.* at 110. The Director of EAD would then decide whether an investigation should be opened, based on specified factors. Def. Ex. A. at 111. If an investigation was opened, the Student Accountability office ("Student Accountability") would then determine the violations to be charged and would notify the respondent of the charges and possible sanctions. Def. Ex. A. EAD would then "inform the respondent of the allegations and provide the respondent with an

---

[1] The 2016-2017 Student Handbook is attached to Defendant's Motion to Dismiss as Exhibit A, and is referred to herein as "Defendant's Ex. A," as it would be duplicative to file it a second time in support of this Memorandum.

opportunity to respond to the allegations, ask questions, provide information, and offer names of witnesses or other people with relevant information." *Def. Ex A.* at 113. EAD would then investigate the allegations. An EAD investigator would be tasked with interviewing the complainant, the respondent, and other witnesses who "may have pertinent knowledge." *Id* at 113. "Both the complainant and the respondent [were] permitted to ask one adviser of their choosing to accompany them to all meetings related to the report of a violation of the [P]olicy." *Id.* at 118. However, neither the complainant nor the respondent was required to have an adviser present *See id.* EAD investigators would then permit the complainant and the respondent to review and comment on their respective interview summaries. *Id.* at 113. Once the EAD investigator had completed the interviews and fact-gathering, a preliminary report would be prepared. *See id.* at 117-118. "Both the complainant and respondent [then would have] the opportunity to submit written comments on the preliminary report." *Id.* at 118. EAD would consider the comments submitted by the parties, if any, and conduct further investigation if needed. *See id.* at 119.

After the investigation was completed, EAD issued a Final Investigative Report. The Final Investigative Report "set[] forth (a) EAD's final determination, based on a preponderance of the evidence, whether the respondent engaged in sexual misconduct in violation of this [P]olicy, and (b) if appropriate, any relevant recommendations." *Def. Ex. A* at 119. The Final Investigative Report also contained "a summary of the information and documents on which the final determination and any recommendations [were] based" and it addressed, "to the extent EAD consider[ed] appropriate, any comments received from the complainant or respondent concerning the preliminary investigative report." *Id.* At no time during the investigative process does Vanderbilt hold a live hearing, or offer the parties the opportunity to confront the witnesses against

them (Def. Ex. A).

If EAD found a violation of the Policy, Student Accountability would render a sanction based on the information in the Final Investigative Report. Def. Ex. A at 121. "The sanctions for Sexual Assault – Intercourse range from suspension to expulsion, and the sanctions for Sexual Assault – Contact or Dating Violence range from disciplinary probation to expulsion." *Id.*

The respondent then had the right to appeal the determination and sanction on any of the following grounds: (1) procedural irregularities in the investigation that were sufficient to affect the determination and/or sanction; (2) insufficient evidence in support of the determination; (3) new evidence that could reasonably be expected to change the determination; and (4) abuse of discretion in sanctioning by Student Accountability. Def. Ex. A at 122-123; Am. Compl. ¶ 94. Appeals were considered by a panel of three Appellate Officers, consisting of "faculty and/or administrators appointed by the Chancellor" who are supposed to receive "annual training on issues involved in sexual misconduct, such as relevant evidence, the appeals process, standards of review, and avoiding actual or perceived conflicts of interest." Def. Ex. A at 121-122. The Appellate Officers decided appeals by majority vote. *Id.* at 119.

### A.     Jane Roe's Complaint Against John Doe

According to Vanderbilt's investigative report, on February 10, 2017, Jane Roe, a female Vanderbilt student, told her resident advisor and a 24-hour crisis support center that Doe had sexually and physically assaulted her early that morning. *See* 2nd Am. Compl ¶ . Jane Roe alleged that she and John Doe engaged in an initially consensual sexual encounter that became nonconsensual when Doe began to choke her in his dorm room. Jane Roe alleged that she did not consent to the choking or to the sexual intercourse and contact that followed it. John Doe maintains that Jane was an active, voluntary participant in the encounter throughout.

Based on Jane Roe's allegations, Vanderbilt referred the matter to EAD, which opened an investigation and provided a summary of Roe's allegations to Student Accountability. *See* 2nd Am. Compl ¶9. Student Accountability charged John Doe with sexual assault- intercourse, sexual assault-contact, and dating violence. Student Accountability provided Doe with a copy of the charge sheet and notice of the charges against him. John Doe indicated on the charge sheet that he disagreed with each of the charges. *See id.* ¶ 12-13.

EAD then investigated Jane Roe's allegations. EAD interviewed Jane Roe three times, John Doe only twice, and over a dozen other witnesses. *See* 2nd Am. Compl ¶ 20-21. The EAD did not hold a live hearing *Id.* ¶ 23-24.

On October 9, 2017, EAD issued its Final Investigative Report (the "Report") and provided it to each party. *See* 2nd Am. Compl ¶ 45. EAD found, based on a preponderance of the evidence, that John Doe committed sexual assault–intercourse and sexual assault–contact during his encounter with Jane Roe in violation of the Sexual Misconduct Policy. *Id.* ¶ 44. In particular, EAD found that John Doe's encounter with Jane Roe became nonconsensual when Doe first engaged in force by choking Jane Roe in his dorm room. *See id.* ¶ 43. EAD further concluded, based on photographs of Jane Roe's body and a medical examination report, that the force Doe used was not part of agreed "rough sex." The EAD did not mention in its final report that the presence of marks on *both* of their bodies indicated that the "rough sex" was consensual.

EAD concluded "that if Jane Roe was intoxicated to the point of incapacitation, [Doe] did ***not know and/or reasonably would not have known*** that she was incapacitated." *See* 2nd Am. Compl ¶ 42 Based on its finding that the sexual encounter became nonconsensual once John Doe choked Jane Roe in Doe's room, EAD concluded that John Doe had committed sexual assault-intercourse, sexual assault-contact, and dating violence in violation of Vanderbilt's Sexual

Misconduct Policy. *See* 2nd Am. Compl ¶ 44.

Vanderbilt informed Doe on October 25, 2017, that he would be expelled based upon the EAD's findings *See* 2nd Am. Compl ¶ 46. John Doe timely appealed on November 3. *Id.* ¶ 47. He also emailed Vanderbilt's Chancellor on December 4, asking him to intercede and reverse the sanction. *Id.* ¶ 49. On or about December 01, 2017, Vanderbilt hired Molly Zlock as it's Title IX Compliance Director *Id.* ¶ 11. Ms. Zlock maintains a facebook page upon which, prior to being hired by Vanderbilt, she posted that "We must always take sides. Neutrality helps the oppressor." *Id.* ¶ 80. Doe's appeal was denied and the sanction upheld just two weeks later, on January 17, 2018. *Id.* ¶ 51. Ms. Zlock has since been promoted to Title IX Coordinator *Id.* ¶ 11.

After his appeal was denied, Doe was escorted to Student Accountability, where he told the Director, defendant Mary Helen Solomon, that he was suicidal *See* 2nd Am. Compl ¶ 52. In response, Solomon threatened Doe that she would call the police if he didn't go the Student Counseling Center. *Id.* ¶ 53. Doe went to the Student Counseling Center, which "determined that Doe was a suicide risk and involuntarily committed [him] to a mental health facility" *Id.* ¶ 54. Vanderbilt did not notify Doe's next of kin that he was suicidal or that he had been hospitalized *Id.* ¶ 55. A friend notified Doe's parents, who live in another country, and Doe's father "checked him out of the hospital" five days later, which was the soonest Doe's father could physically get to the United States and Vanderbilt. *Id.* ¶¶ 61-62.

On June 22, 2018, John Doe sued the University for alleged violations of Title IX, breach of contract, promissory estoppel, intentional infliction of emotional distress, and negligence under a number of theories. *See Amended Complaint Substituted for Original Complaint.*

## II.    <u>STANDARD OF REVIEW</u>

Pursuant to FED. R. CIV. P. 8(a)(2), all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading standard prescribed by FED. R. CIV. P. 8(a) does not obligate a plaintiff to set forth "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). It merely requires the plaintiff "to 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). Accordingly, to survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

According to the United States Supreme Court, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); see also *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 405 (6th Cir. 1997). "Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion." *Chalmers v. Clemons*, 359 F. Supp. 2d 700, 702 (W.D. Tenn. 2005). "[E]ven if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied." *Id*.

Recently, In *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), the Second Circuit found that Title IX discrimination claims were entitled to a temporary presumption reducing the facts needed to plead discriminatory intent, much like the modified pleading standard it applies in Title VII employment-discrimination cases. To that end, the Second Circuit held that a plaintiff under Title IX must only plead a "minimal plausible inference" of discriminatory intent to survive a motion to dismiss. The Second Circuit opined that the modified pleading standard reduces the facts needed to be pled under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which require a plaintiff to plead specific facts sufficient to support a plausible inference that a defendant is liable under the claim asserted. Plainly put, the Second Circuit's ruling in *Columbia University* makes it easier for a student disciplined by his or her university for sexual misconduct to bring claims of gender discrimination against the university under Title IX.

While it is true that the Sixth Circuit declined to adopt this standard in its recent decision in *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)*,* Plaintiff submits to the Court that there is no time like the present to change its mind. In light of the #MeToo movement and the rampant discrimination against accused males on college campuses, it would be prudent and discerning for this court to now hold that it is going to reduce barriers to justice for the accused, and adopt the pleading standard set forth in *Columbia University* for Title IX claims.

### III.     ARGUMENT

**1.   John Doe has properly pled his Title IX Claims.**

The Sixth Circuit recognizes "four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias" can advance: (1) "erroneous outcome," (2) "selective enforcement," (3) "deliberate indifference," and (4) "archaic

assumptions." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). Doe's Second Amended Complaint properly pleads his claims according to the standards articulated therein.

a. **John Doe's Second Amended Complaint properly pleads his Erroneous Outcome claim under Title IX.**

To plead an erroneous outcome Title IX claim, a plaintiff must allege: "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized . . . causal connection between the flawed outcome and gender bias." *Miami Univ.*, 882 F.3d at 592 (internal quotation marks omitted); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994) (requiring plaintiff to "specifically allege . . . circumstances giving rise to a plausible inference . . . of discriminatory intent"). The court in *Miami University* 882 F.3d at 592 further discussed circumstances giving rise to a plausible inference of discriminatory intent in this passage:

> "...John also asserts that Miami University faced external pressure from the federal government and lawsuits brought by private parties that caused it to discriminate against men. ……..Additionally, John contends that Miami University was facing pressure to increase the zealousness of its "prosecution" of sexual assault and the harshness of the sanctions it imposed because it was a defendant in a lawsuit brought by a student who alleged that she would not have been assaulted if the University had expelled her attacker for prior offenses……...Considering all of these factual allegations relating to Miami University's pattern of activity respecting sexual-assault matters and the asserted pressures placed on the University, John has pleaded sufficient specific facts to support a reasonable inference of gender discrimination. At the pleading stage, John's allegations need only create the plausible inference of intentional gender discrimination."

The facts alleged in the instant case satisfy both prongs of this requirement.

Plaintiff asserts, *inter alia,* that the following facts cast articulable doubt on the accuracy of the outcome of the relevant proceedings: the fact that Jane initiated the sexual contact that night, the fact that there were marks on *both* John and Jane's bodies, the fact that Jane stated that she was

"fine with" the sexual encounter when it began, the fact that John indicated that the encounter was consensual and that Jane actively participated throughout, and the fact that the EAD found that, if Jane lacked the capacity to consent at any point, John could not have known it.

Plaintiff further alleges circumstances giving rise to a plausible inference that the erroneous outcome is the result of gender bias. Doe describes Title IX Coordinator Molly Zlock's glaring bias against accused males,[2] and points out to the court thats she was openly and unabashedly biased towards female victims when Vanderbilt hired her. Ms. Zlock was the Title IX Coordinator in the case referenced by Defendants, *Doe v. Belmont*, 2018 WL 4627033. It stands to reason, then, that Vanderbilt's EAD, or Title IX department, were looking for someone with Ms. Zlock's biases.

Plaintiff further alleges that Vanderbilt is under pressure to retain its federal funding, to avoid negative publicity, and to protect its brand and image at the expense of accused male students. Defendant characterizes this assertion in its Motion to Dismiss as "...General allegations about public pressure to resolve sexual assault complaints," which it contends are "insufficient to show that gender bias was the motivating factor in the erroneous result." In reality, Vanderbilt is under more intense scrutiny than most universities regarding Title IX cases. Vanderbilt is still trying to overcome, and distance itself from, the egregious and now infamous Vanderbilt rape case. The Vanderbilt rape case, which made national headlines, included several accused rapists, and led to multiple trials, began in 2013 and has just come to a conclusion over 5 years later. The Vanderbilt rape trials have donned the same infamy as the Duke lacrosse scandal, only in the Vanderbilt case, the men accused were actually guilty of multiple rapes of one woman. Vanderbilt

---

[2] Molly Zlock has expressed her belief that "We must always take sides. Neutrality favors the oppressor," among other things. *See* 2nd Am. Compl. Ex. A and B for this and other examples.

Has something to prove to all who are watching. Vanderbilt feels that it must prove to prospective students, parents, and financial contributors, that it protects females and does not condone sexual assault. One recent article in the Tennessean newspaper (out of hundreds) stated:

> "[the] Vanderbilt rape case brought college sexual assault 'to the forefront'""It put the spotlight on sexual assaults on college campuses throughout the country," said Metro police detective Chad Gish, who developed pivotal digital evidence in the case. "The Vanderbilt case, that kind of brought it to the forefront." Experts in sexual assault and law enforcement drew a direct connection between the conversations and changes that followed and broader movements like #MeToo. "These terrible things happen, and we've been intimately privy to the details through the Vanderbilt rape case," said Rachel Freeman, president of the Nashville Sexual Assault Center. "That has been really sad and really hard to hear." The Tennessean.[3]

Vanderbilt has more than one concern in this case, and in all others like it, leading Vanderbilt to find for the accuser most of the time, whether the evidence supports that finding or not. Vanderbilt is too fearful of another situation causing national attention. In short, it is politically dangerous for Vanderbilt to find an accused male "not responsible" in a title IX case. Under *Doe v. Miami University,* 882 F.3d 579 (C.A.6 2018), these facts are more than enough to support a reasonable inference of gender discrimination. Therefore, Plaintiff's Erroneous Outcome claims should not be dismissed.

Furthermore, the Sixth Circuit has explained that the accused individual in a Title IX case must be given the opportunity to share his version of the events at some kind of hearing. *Doe v. Univ. of Cincinnati*, 872 F.3d at 399–400. Last month, in *Doe v. University of Michigan*, 2018 WL 3329575, (E.D.Mich., 2018), the Court found that "Without a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is

---

[3] Published 7:06 p.m. CT June 22, 2018.

significant." It then proceeded to order UM to hold a live hearing and afford the Plaintiff the opportunity to face his accuser. Vanderbilt does not afford the accused student any type of hearing whatsoever. While Plaintiff recognizes that the universities of Michigan and Cincinnati are public universities and Vanderbilt is a private university, he submits to the court that if the receipt of federal funding triggers the application of Title IX, then the receipt of federal funding ought to also trigger to the obligation to afford a student due process. It is ridiculous for the courts to apply Title IX to a defined set of schools, *i.e.* all those that receive federal funding, yet then maintain different sets of rules for different types of schools within that set. If Title IX is to be applied at all, it ought to be applied the same way for every student at every school. The risk of depriving a young man of his reputation, education, and employment is no *less* significant because he attends a private school. Vanderbilt's investigative procedure did not afford Doe due process, therefore, the outcome must be deemed erroneous and the matter should be remanded to Vanderbilt for proceedings consistent with *University of Michigan*.

> b. **John Doe's Second Amended Complaint properly pleads his Deliberate Indifference claim under Title IX.**

A deliberate indifference claim must show "that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Doe v. Miami Univ.*, 882 F.3d at 590. In his Second Amended Complaint, Plaintiff alleges that those responsible for deciding his appeal, particularly Title IX Compliance Manager Molly Zlock, had actual notice of the University's failure to provide him with due process, and that they were deliberately indifferent to the same *because of his gender.* In support of this assertion, Plaintiff points out that he was not afforded the opportunity to participate in a live hearing or to confront the witnesses against him, and that Molly Zlock, who was responsible for

seeing to it that Vanderbilt's actions complied with Title IX, is openly and vocally biased against males accused of sexual assault.[4]

Plaintiff acknowledges that *Doe v. Miami University,* 882 F.3d 579 says what it says regarding the need to connect a deliberate indifference claim to allegations of sexual assault, and Plaintiff asserts that Title IX jurisprudence has evolved to the point that this requirement needs to be re-thought. In *Doe v. University of Michigan*, 2018 WL 3329575, (E.D.Mich., 2018), the Court acknowledges that the risk to an accused student's reputation, education, and employment are significant. Furthermore, when dealing specifically with Title IX cases, the courts have begun to address some specific indices of this new arena of cases which may not arise in other areas of litigation. For example, "...the "discrimination" that Title IX prohibits is not the acts of sexual assault or sexual harassment in and of themselves, but rather the differential treatment by a funding recipient of persons of a particular sex who are taking part or trying to take part in its educational program or activity but are suffering acts of sexual harassment or assault that undermine their educational experience. *Cf. Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("We have never held that workplace harassment ... is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring) ) ). *Doe v. Brown University,* 896 F.3d 127, 132 (C.A.1 (R.I.), 2018)

The same logic should be applied when Vanderbilt University is deliberately indifferent to

---

[4] See extensive examples of bias in Exhibit A to Second Amended Complaint.

a student's Constitutional Rights. Because Defendant failed to provide Doe with due process, knew that it failed, and was deliberately indifferent to the failure, this Court should hold that the potential damage to Doe arising out of such indifference is so significant that he ought to be able to seek redress in the courts for it.

**2. Doe's Second Amended Complaint properly states a claim for Declaratory Judgment.**

Defendant's allegations that Doe has not stated a claim for which relief can be granted under Title IX are addressed in the two prior sections. In his Second Amended Complaint, Doe properly states claims under Title IX for Erroneous Outcome, Deliberate Indifference, and Selective Enforcement.

Vanderbilt asserts that there is not a private right of action under Title IX, however, the Supreme Court held otherwise in *Doe v. Brown University,* 896 F.3d 127. In fact, in this case the court was not dealing with whether or not there was a private right of action, but how far it would extend. The question of whether or not there was a private right of action was implied by all at the onset. "The Supreme Court has recognized an implied "private right of action to enforce [Title IX's] prohibition on intentional sex discrimination," see *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690-93, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), which includes actions for monetary damages by private persons and "encompasses intentional sex discrimination in the form of a recipient's deliberate indifference." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).

Doe does not base his claim for declaratory relief solely on Vanderbilt's failure to follow administrative regulations. Rather, Doe is alleging that Vanderbilt's policies, as they are written and as they were applied to him, discriminate against him because of his gender in violation of Title IX. The fact that Defendant has violated administrative guidelines is relevant evidence

supporting the broader claim of discrimination. Plaintiff has alleged ample facts in support of his discrimination claim, therefore, his claim for declaratory judgment should not be dismissed.

**3. Doe Properly states a claim for Breach of Contract.**

In Tennessee, to allege a breach of contract a plaintiff must plead (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach. *Thomas v. Meharry Med. Coll.*, 1 F.Supp.3d 816, 828 (M.D. Tenn. 2014). The Tennessee Supreme Court "has not ... enunciated the standard which should be applied in a dispute arising out of the university-student relationship." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988). However, the U.S. Court of Appeals for the Sixth Circuit, applying Tennessee law, has stated that "the student-university relationship is contractual in nature," although courts "have rejected a rigid application of contract law in this area." *Sifuna v. S. Coll. of Tenn., Inc.,* No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018); *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005). Generally speaking, this relationship is implied as opposed to express. *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011); see also i, 142 F. App'x at 255 (holding that, even though Vanderbilt's Student Handbook, including policies that were "not intended to be all-inclusive and do not constitute a contract," was not an express written contract, its provisions may be enforced in Tennessee as an implied contract); *Doe v. Univ. of South,* No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011) (holding same as to university's sexual assault policies and procedures); accord *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011)(under parallel contract law, finding implied contract exists between student and university). Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship. *Atria*, 142 F. App'x at 255. 2017).

A disciplinary action by a university is the appropriate subject matter of a breach of contract action. *Id*. However, "[c]ontracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities." *Valente v. Univ. of Dayton,* 438 F. App'x 381, 384 (6th Cir. 2011).

Vanderbilt has violated an express or implied contract by failing to provide Doe with a "fair" adjudicatory process. *First*, Vanderbilt's disciplinary process was contractually flawed because the Policy does not require an employee or investigator to act without bias. *See* Second Am. Compl. ¶ 73. While it may be true that "a disciplinary committee is entitled to a *presumption* of honesty and integrity," *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 256 (6th Cir. 2005)(*emphasis added)*, that is merely a presumption and it can be rebutted. The fact that Vanderbilt willingly hired Molly Zlock as its Title IX Compliance Manager, knowing that she is vocally biased against males accused of sexual assault[5], is an allegation sufficient to rebut any presumption of honesty and integrity in the Vanderbilt Title IX system. It follows that those who report to Zlock, whether they are individual investigators or committee members, are under at least some pressure to conform their job performance to her world-view. In several instances, the EAD made a finding of fact based solely on Jane Roe's statement, but in no case did the EAD make a finding of fact based solely on John Doe's statement. Defendant proffers that assessing the credibility of witnesses is well within the discretion of the University's fact finder, *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 712-713 (S.D. Ohio 2015), This Sixth Circuit, however, in *Doe v. Univ. of Cincinnati,* 872 F.3d 393*,* explained that "[c]ross-examination is `not only beneficial, but essential to due process' in a case that turns on credibility because it guarantees that the trier of fact

_____

[5] Molly Zlock has expressed her belief that "We must always take sides. Neutrality favors the oppressor." *See* 2nd Am. Compl. Ex. A and B. for other examples.

makes this evaluation on both sides." *Id. at 402 (quoting <u>Flaim, 418 F.3d at 641</u>)*, and the Eastern District of Michigan, just last month, required UM to hold a live hearing in order to accurately assess credibility. Plaintiff recognizes that this court recently declined to apply *Univ. of Cincinnati* and <u>*Doe v. Baum*, ⸺ F.3d ⸺, ⸺ – ⸺, No. 17-2213, 2018 WL 4265634, at *1-6 (6th Cir. Sept. 7, 2018)</u> in its decision in *Doe v. Belmont University* 2018 WL 4627033, however, Plaintiff again submits to the Court that there is no time like the present to change its mind. If the receipt of federal funding triggers the application of Title IX, then the receipt of federal funding ought also trigger the obligation to provide due process to students accused of sexual misconduct.

Aside from the case law itself, It is foolhardy to think that an investigator who conducts a telephone interview with a witness, who never sees the witnesses facial expressions or body language, and who never sees the witnesses demeanor when challenged by the accused, can accurately determine credibility. Furthermore, that investigator works for the biased Molly Zlock, and has the latitude to include or exclude whatever portions of the interview he or she wishes to include or exclude. Per the Student Handbook (Def. Ex. A), the Final Investigative Report contains "a ***summary*** of the information and documents on which the final determination and any recommendations [were] based" and it addressed, "***to the extent EAD consider[ed] appropriate***, any comments received from the complainant or respondent concerning the preliminary investigative report. ***(emphasis added).***" This policy leaves the door wide open for bias, and that by itself is enough to plausibly support allegations of significant bias against Doe. Further evidence of bias is likely to be located during the discovery process, but for the purposes of this Motion, plaintiff has alleged facts supporting a plausible inference of bias.

*Second*, Doe's Second Amended Complaint does not include allegations that he was not permitted to select an advisor with legal training.

*Third*, Vanderbilt failed to make use of competent, trained, and unbiased investigators. 2nd Am. Compl. ¶¶ 93-96. This allegation is premised on the same facts that support Doe's allegation that Vanderbilt breached an implied contract by failing to *require* unbiased investigations as a matter of policy. Additionally, this allegation is supported by the facts alleged regarding Molly Zlock. While she may not have been an actual investigator, the fact that Vanderbilt would hire her, knowing she was biased against accused males, and make her responsible for the University's compliance with Title IX, is evidence of institutional bias at every level, including the investigators. Therefore, these allegations state a claim for the same reasons previously discussed.

*Fourth*, Vanderbilt failed to Provide Doe with an opportunity to cross-examine witnesses at a hearing. 2nd Am. Compl. ¶¶ 23-24. The Sixth Circuit settled the need for some sort of cross-examination, whether direct or indirect, in *Doe v. Univ. of Cincinnati*, 872 F.3d 393*,* and it follows that such opportunity would require some kind of live proceeding. Vanderbilt's Policy does not "provide for any sort of hearing for students accused of sexual misconduct." *Id.* Defendant states this as if it resolves the question of whether Doe was entitled to a hearing, but it does not. The Sixth Circuit had previously explained that the accused must be given the opportunity to share his version of the events and to face and cross-examine his accuser. *Id.* at 399-400, and more recently, the Eastern District of Michigan has held in *Doe v. University of Michigan*, 2018 WL 3329575, (E.D.Mich., 2018) that fairness in that case required a live proceeding, as discussed *supra*. Defendant asserts that this Court's recent holding in *Doe v. Belmont University* 2018 WL 4627033 renders recent due process decisions inapplicable and "of no consequence." Plaintiff disagrees, and submits that such cases are instructive regarding the need for all accused students to be afforded due process.

Defendant asserts that it cannot breach promises it never made, and that, ("While a

university cannot ignore its duty to treat its students fairly, neither is it required to transform its classrooms into courtrooms."), *aff'd*, 787 F.2d 590 (6th Cir. 1986). Plaintiff is not requesting that Vanderbilt turn its classrooms into courtrooms, rather, he is alleging that its failure to provide 1) a hearing; and 2) an opportunity to face his accuser, has deprived him of a fair and impartial determination of the charges laid against him. It follows that that deprivation is a breach of the University's contractual obligation to him.

*Fifth*, Vanderbilt found Doe responsible for sexual misconduct without sufficient evidence. Defendants allege that Doe does not plead any facts demonstrating that EAD's conclusions were not supported by a preponderance of the evidence. To the contrary, Doe alleges that the EAD took Jane's word over his in all cases. Doe points out that a significant portion of this investigation turns on "he said vs. she said," and that in a situation where assessing credibility was critical, Doe was not afforded a hearing or a chance to face his accuser (*See* discussions of *Doe v. Univ. of Cincinnati,* 872 F.3d 393 and *Doe v. University of Michigan*, 2018 WL 3329575, (E.D.Mich., 2018)*, supra)*. Doe also alleges significant bias on the part of Molly Zlock and those she supervises, and, perhaps most importantly, Doe alleges Vanderbilt's obsessive desire to protect female accusers at all costs following the Vanderbilt Rape trials. Those allegations, taken together, are more than enough to create a plausible inference that the EAD's conclusions were supported by something other than evidence.

Finally, Vanderbilt did not afford Doe a meaningful right of appeal. 2nd. Am. Compl. ¶¶ 104-109. To support this contention, Doe alleges that the "Appellate Officers who considered [his] appeal did not have training in adjudication, in the law, in the weighing of evidence, or in the relevance o[r] irrelevance of types of evidence in the alleged sexual misconduct investigation setting." *Id.* ¶ 106. Whether those officers do or do not have such training is discoverable, but at

this time, the evidence that this allegation is true rests in the hands of the Defendant. Doe has thoroughly alleged that Vanderbilt knew about the fundamental unfairness and the deprivation of Constitutional rights that pervaded the investigation into Jane Roe's complaint, and yet, when he appealed, the appellate officers and the biased Molly Zlock did nothing to right the wrongs he had suffered. It follows, then, that said officers did not have adequate, appropriate training regarding how to consider an appeal. This is enough to support the plausible inference that the appellate officers lack appropriate training, as alleged.

**4. Doe's Second Amended Complaint has properly pled his Promissory Estoppel claim.**

Doe's Second Amended Complaint properly pleads his claim for promissory estoppel by alleging that Vanderbilt's actions, specifically, promising him an education in exchange for his tuition, and then expelling him for a sexual encounter that he maintains was consensual, is equivalent to fraud in that Vanderbilt mislead him into believing that it would provide the education he paid for without interruption or interference, and then interfered by expelling him for something that he didn't do. Essentially, Defendant defrauded Doe in order to protect itself from possible negative publicity and to enrich itself by retaining his tuition.

**5. Doe has properly pled Intentional Infliction of Emotional Distress.**

In Tennessee, a plaintiff must "show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (quoting *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)). Doe was an international student, holding citizenship both in India and in U.S. *See* 2nd Am. Compl. ¶4. After finding Doe responsible for sexual assault, as the result of an encounter that he maintains was consensual, Doe became suicidal *See* 2nd Am. Compl. ¶ 52. Vanderbilt

threatened to call the police on Doe if he didn't go to the Student Counseling Center, whereupon he went, and was then committed to a mental health facility, at which time Vanderbilt disclosed protected information to the hospital *See* 2nd Am. Compl. ¶ 58. The most outrageous thing about this series of events is that Vanderbilt never took any action to notify Doe's next of kin (his parents, who live in India) that he was suicidal *or* that he had been committed to an institution. *See* 2nd. Am. Compl. ¶¶ 55-60. To threaten, and then commit a depressed, suicidal student to an institution, with no support and without telling anyone who cares about him where he is or what has happened, absolutely rises to the level of outrageous.

**6. Doe's Second Amended Complaint properly pleads his Negligence Claims.**

Doe can assert negligence *per se* claims based Title on IX. Defendants assert that he cannot pursue such a claim because his substantive Title IX claims fail, but, Doe's Second Amended Complaint properly pleads three such substantive claims according to the standards articulated in *Doe v. Miami.* Therefore, his negligence *per se* claim based upon Title IX is properly pled. *See discussion supra at* ¶ 1a-1b.

*Further*, Doe's Second Amended Complaint properly alleges a plausible negligent training and supervision claim. Doe asserts that Vanderbilt's Title IX Compliance Manager lacked the proper training to carry out his responsibilities in administering the Sexual Misconduct Policy. This allegation is supported by the fact that Marshall did nothing to correct procedural deficiencies in the investigation that he knew about, and had the ability to correct. Had Vanderbilt trained Marshall appropriately, it is probable that Doe would not have suffered the damages he has suffered. This is enough to support a plausible inference that Vanderbilt was negligent in supervising and training Marshall.

Doe's Second Amended Complaint properly states a claim against the individual

defendants, by alleging that Bell's and Solomon's biased conduct is 1) prohibited by Title IX; 2) was grossly negligent; and 3) that their biased actions were outside the scope of their employment *See* 2nd Am. Compl. ¶¶ 131-137. Specifically, Doe alleges that Bell acted with bias in encouraging Doe to file her complaint *See* 2nd Am. Compl. ¶ 10, and acted with bias when she knew Vanderbilt was denying Doe due process, and did nothing about it *See* 2nd Am. Compl. ¶¶ 172-176. Doe further alleges that Solomon threatened him, prevented the mental health hospital from contacting his next of kin, and that she disclosed protected educational information, i.e. that he was involved in a Title IX investigation, to the hospital *See* 2nd Am. Compl. ¶¶ 54-60. Taken together, these allegations are sufficient to state a claim for against the individual defendants.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied in full.

DATED this 23rd day of October, 2018.

Respectfully Submitted,

Joyce Cooper #30855
Michelle Owens #26512
Agee Owens Cooper, LLC
110 N. Spring St. STE 100
McMinnville, TN 37110
(931) 507-1000
jcooper@ageeowenslaw.com
mowens@ageeowenslaw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

 I hereby certify that a copy of the foregoing is being forwarded to counsel of record via the Court's ECF system.

Tim K. Garrett (BPR# 012083)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 742-6200
tgarrett@bassberry.com


Sheree C. Wright (BPR# 011195)
Office of the General Counsel
Vanderbilt University
2100 West End Avenue, Suite 750
Nashville, TN 37203
Telephone: (615) 322-5158
sheree.wright@vanderbilt.edu


Bruce M. Berman (DC# 333948)
Wilmer Cutler Pickering Haleand Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6173
bruce.berman@wilmerhale.com


         This 23rd of October , 2018


         Joyce Cooper