IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-00569 |
| | ) | |
| VANDERBILT UNIVERSITY, et al., | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE FRENSLEY |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court is Defendants' Motion to Dismiss. (Doc. No. 39). Plaintiff filed a Response in Opposition (Doc. No. 42), and Defendants filed a Reply. (Doc. No. 43). For the reasons discussed below, Defendants' Motion to Dismiss is **GRANTED**.

## I.     PROCEDURAL BACKGROUND

Plaintiff, a former Vanderbilt University ("Vanderbilt") student, brings this action arising out of Vanderbilt's investigation of an accusation of sexual misconduct made against him by a female student ("Jane Roe"). After the investigation, Vanderbilt concluded sexual misconduct had occurred and expelled Plaintiff as a sanction. On September 24, 2018, Plaintiff filed a Second Amended Complaint asserting numerous causes of action, specifically (1) Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"); (2) the Declaratory Judgment Act, 28 U.S.C. § 2201; (3) breach of contract; (4) promissory estoppel; (5) intentional infliction of emotional distress; (6) negligence; (7) gross negligence; (8) negligent infliction of emotional distress; and (9) negligent training and supervision of employee claims, including sub-claims based on different theories of liability. (*See* Doc. No. 35). On October 9, 2018, Defendants

moved to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted. (Doc. No. 39).

## II.    FACTUAL BACKGROUND

Vanderbilt is a private university located in Nashville, Tennessee, that accepts federal funding. (Doc. No. 35 at ¶ 5). Plaintiff, a citizen and resident of Mumbai, India, was a sophomore at Vanderbilt in the spring of 2017. (*Id*. at ¶¶ 4, 14). Upon enrolling at Vanderbilt, Plaintiff – like every other student – became (1) generally bound by Vanderbilt's honor code, which is embodied in the "Community Creed," and (2) specifically governed by the policies and regulations set forth in the Vanderbilt Student Handbook ("Handbook").

### A.  Vanderbilt's Sexual Misconduct Policy

The Handbook includes a dedicated disciplinary policy concerning "Sexual Misconduct and Intimate Partner Violence" ("Sexual Misconduct Policy"). (Doc. No. 41-1 at 105-126). Vanderbilt recommends that students make complaints of sexual misconduct directly to its Equal Opportunity, Affirmative Action, and Disabilities Services Department ("EAD"), which is led by the University's Title IX Coordinator (at the time Anita Jenious), and has responsibility for administrative investigation of reports of Sexual Misconduct Policy violations. (*Id*. at 115, 106). "The Title IX Coordinator, EAD staff, the Director of Student Accountability, and Project Safe Center staff are trained at least annually, and on an ongoing basis, on issues related to sexual harassment, sexual misconduct, and intimate partner violence, and in in conducting investigations in a manner that protects the well-being and safety of the complainant, the respondent, and the University community." (*Id*. 40-1 at 125). Students may also make an initial complaint to another Vanderbilt employee, and that person will refer the matter to EAD. (*Id*. at 108).

2

## B. The Sexual Misconduct Policy Complaint and Investigation Process

After a complaint of a violation of the Sexual Misconduct Policy is brought to the attention of EAD, the Title IX Coordinator will determine whether EAD should conduct an investigation. (Doc. No. 40-1 at 116-17). The EAD will conduct an intake process to assist the Title IX Coordinator in determining how to proceed with a sexual misconduct report and whether interim measures are needed. (*Id*. at 116). The intake process may include preliminary interviews of the complainant, respondent, or witnesses, consultation with other University offices, and initial review of potentially relevant evidence. (*Id*.).

Upon a determination by the Title IX Coordinator that an investigation involving a student respondent will be conducted, "EAD will normally provide a summary of the allegations to the Director of Student Accountability," who will then "determine the charge(s) to be brought, if any, and present the charge(s) and possible sanctions to the respondent." (*Id*. at 117). "After the presentation of any charge(s), "the respondent will have the opportunity to agree or disagree with each of them." (*Id*.). "Whether or not Student Accountability has already presented the charges, EAD will inform the respondent of the allegations, provide the respondent an opportunity to respond to the allegations, ask questions, provide information, and offer names of witnesses or other people with relevant information." (*Id*.).

The Sexual Misconduct Policy provides that EAD investigators will interview the respondent and other individuals that it determines "may have pertinent knowledge." (*Id*.). "Potentially relevant information and documents may be collected from the complainant, respondent, witnesses, and third parties." (*Id*.). The Sexual Misconduct Policy states that the EAD will prepare summaries of its interviews, and the complainant and the respondent will be given the opportunity "to review and revise the summary of their own interview." (*Id*.).

3

During an investigation, both a complainant and respondent are permitted to have an "adviser" of their choosing to accompany them to meetings related to the report of a violation of the Sexual Misconduct Policy. (*Id*. at 116, 118). The adviser for either party may confer privately with that party, but may not speak on the party's behalf or otherwise participate in any meeting. (*Id*. at 118).

Prior to making a final determination, EAD prepares a preliminary investigation report that contains a summary of the information and documents that EAD considers relevant to whether the respondent violated the Sexual Misconduct Policy. (*Id*. at 117). The complainant and respondent are each given an opportunity to review a copy of the preliminary investigation report. (*Id*.). Both the complainant and respondent are then allowed to submit, within five days, up to five pages of written comments. (*Id*. at 118). After considering those comments on the preliminary report, EAD issues a final investigation report that sets forth EAD's final determinations, based on a preponderance of the evidence (i.e., more likely than not) standard, regarding whether the respondent engaged in sexual misconduct in violation of the Sexual Misconduct Policy. (*Id*. at 119). The final investigation report contains a summary of the information and documents on which it is based and addresses, "to the extent EAD considers appropriate," any comments received from the complainant or respondent on the preliminary report. (*Id*.). The parties' comments to the preliminary investigation report are also appended to the final investigation report. (*Id*.). When the respondent is determined to have engaged in the conduct for which the respondent was charged, the final investigation report will also be forwarded to the appropriate person for sanctioning, referral, or follow-up – in the case of a student respondent, the Director of Student Accountability. (*Id*.).

4

If the EAD has determined that a respondent violated the Sexual Misconduct Policy, "Student Accountability will review EAD's final investigation report and will render an appropriate sanction." (*Id*. at 121). The sanctioning determination is made "based on the information contained in the EAD investigative report, with particular regard for the nature of the incident, the respondent's reported cooperation and candor, and the respondent's disciplinary history (if any)." (*Id*.). The range of sanctions for any student found responsible for sexual assault-intercourse is suspension to expulsion; for sexual assault-contact, dating violence, or the other delineated forms of sexual misconduct the sanctions range from disciplinary probation to expulsion. (*Id*.).

### C. The Sexual Misconduct Policy Appeal Process

Either party has the right to appeal a determination by EAD and any sanction rendered by Student Accountability. (Doc. No. 40-1 at 121). Student appeals are decided by a panel of three Appellate Officers for Sexual Misconduct ("Appellate Officers"). (*Id*.). Appellate Officers are faculty and/or administrators, appointed by the Chancellor (or the Chancellor's designee) for two or three-year terms, who receive annual training on issues involved in sexual misconduct, such as relevant evidence, the appeals process, standards of review, and avoiding actual or perceived conflicts of interest. (*Id*. at 121-122). A respondent assessed with a sanction may submit a written appeal petition within ten days of the date the complainant and respondent are notified of the sanction. (*Id*. at 122). The petition must include a statement of the grounds for appeal, a supporting explanation, and copies of, or reference to, all information not previously submitted to the EAD that the petitioner wishes the Appellate Officers to consider. (*Id*.).

There are only four limited grounds for appeal, however, and "new" information will only be considered in the limited context of those contentions. The possible grounds for appeal are:

5

a. Procedural irregularities sufficient to affect the determination or sanction;[1]

b. The evidence does not support the determination;[2]

c. New evidence that was not reasonably available for presentation to EAD, the introduction of which could reasonably be expected to affect EAD's determination;[3] or

d. Severity of the sanction imposed by Student Accountability.[4]

(Doc. No. 40-1 at 122-23). As part of the appeal process, the petition is sent to the Title IX Coordinator, Student Accountability, and the non-petitioning student, and those parties are given an opportunity to submit a written response. (*Id*. at 123). The petitioning student may then reply. (*Id*.).

The Appellate Officers then proceed to consideration of the appeal. "The Appellate Officers' consideration of the appeal must be based only on (a) the original records created by or provided to EAD and/or Student Accountability, including the final investigation report, (b) the petition, (c) any new evidence in the petition that was not reasonably available for presentation to EAD and the introduction of which could reasonably be expected to change EAD's determination,

---

[1] "In the judgment of the Appellate Officers," harmless procedural irregularities are not a basis for modifying a determination or sanction. (Doc. No. 40-1 at 122).

[2] Appellate Officers may not alter EAD's determination unless it is "not reasonably supported by a preponderance of the evidence." (Doc. No. 40-1 at 122). "It is not the role of Appellate Officers to substitute their judgment for the judgment of EAD if there is a reasonable basis for EAD's determination based on the preponderance of the evidence. Deference must be given to EAD's determination since EAD had the opportunity to hear the witnesses and to assess their credibility and demeanor." (*Id*.).

[3] A student who seeks to offer new evidence in support of an appeal must show that the evidence was not reasonably available for presentation to EAD, and that the introduction of such new evidence can be reasonably expected to have changed EAD's determination. If the Appellate Officers determine that the student has satisfied this burden, the Appellate Officers remand the case to EAD with instructions to reconsider it in light of the new evidence. (Doc. No. 40-1 at 122-123).

[4] Appellate Officers may not substitute their judgment for the reasonable decision of Student Accountability with respect to sanctions. Sanctions may be vacated or changed upon a finding, based on the totality of the relevant facts and circumstances, that the sanctions imposed by Student Accountability are the product of an abuse of discretion. (Doc. No. 40-1 at 123).

6

(d) any written comments/response, and (e) any reply. (Doc. No. 40-1 at 123). The Appellate Officers decide by majority vote whether to affirm, modify, or reverse the determination by EAD and/or sanction imposed by Student Accountability or to remand the case to EAD and/or Student Accountability with instructions. (*Id*.). "At no time may Appellate Officers substitute their opinions or values for University policy." (*Id*.).

### D. Factual Allegations

On February 10, 2017, a sophomore at Vanderbilt, Jane Roe, reported sexual misconduct involving Plaintiff to a resident advisor. (Doc. No. 35 ¶¶ 8, 15). The Associate Dean of Students, Community Standards and Student Support, referred the matter to the Equal Opportunity, Affirmative Action, and Disabilities Services Department ("EAD"). (*Id*. at ¶ 9). Three days later, on February 13, 2017, the Director of Project Safe, Defendant Cara Tuttle Bell, also referred the matter to EAD. (*Id*.).

EAD interviewed Jane Roe on March 1, 2017 and March 21, 2017. (*Id*. at ¶ 20). On March 31, 2017, the Office of Student Accountability, Community Standards, & Academic Integrity, charged Plaintiff with sexual assault-intercourse, sexual assault- contact, and dating violence, as the result of the complaint filed by Jane Roe. (*Id*. at ¶ 12). Plaintiff indicated on the charge sheet that he disagreed with the charge. (*Id*. at ¶ 13).

EAD then interviewed Plaintiff on April 27, 2017 and on August 2, 2017 (via telephone). (*Id*. at ¶ 21). Jane Roe was interviewed a third time by the EAD on July 6, 2017. (*Id*. at ¶ 20). Jane Roe attended all interviews with her chosen advisor. (*Id*. at ¶ 20). Plaintiff was not encouraged to select an advisor and did not have an advisor attend either of his interviews. (*Id*. at ¶¶ 90, 21).

On or about October 10, 2017, EAD issued its investigative report and findings. (Doc. No 35 ¶ 45). In its Findings of Fact, EAD concluded, based on the preponderance of the evidence, and

7

taking all of the evidence into account, "that if Jane Roe was intoxicated to the point of incapacitation, [Plaintiff] did not know and/or reasonably would not have known that she was incapacitated" and that "from the point at which [Plaintiff] choked Jane Roe, the incident became nonconsensual." (*Id*. at ¶¶ 42-43). EAD concluded that Plaintiff committed sexual assault-intercourse, sexual assault-contact, and dating violence in violation of the 2016-2017 Sexual Misconduct and Intimate Partner Violence Policy. (*Id*. at ¶ 44).

On October 25, 2017, Plaintiff was informed that his sanction would be expulsion. (*Id*. at ¶ 46). Plaintiff appealed his expulsion on November 3, 2017. (*Id*. at ¶¶ 47-48). Plaintiff also emailed Vanderbilt's Chancellor on December 4, 2017, asking him to reverse his expulsion. (*Id*. at ¶ 49).

On January 17, 2018, Plaintiff was informed that his appeal had been unsuccessful and escorted to Student Accountability. (*Id*. at ¶ 51). Plaintiff informed the Director of Student Accountability, Defendant Mary Helen Solomon, that he was suicidal. (*Id*. at ¶ 52). Defendant Solomon told Plaintiff that she was either going to call the police or accompany him to the student counseling center. (*Id*. at ¶ 53). The student counseling center determined that Plaintiff was a suicide risk and involuntarily committed him to a mental health facility. (*Id*. at ¶ 54). Plaintiff spent five nights in the hospital before his father checked him out. (*Id*. at ¶¶ 61- 62).

Plaintiff alleges that Defendant Solomon prevented the hospital from notifying Doe's next of kin and did not notify his next of kin herself. (*Id*. at ¶ 55). Plaintiff further alleges that upon admitting Doe to the Vanderbilt hospital mental health facility, Vanderbilt or Defendant Solomon provided the hospital with Doe's educational records, in violation of the Family Educational Rights and Privacy Act. (*Id*. at ¶ 58).

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6), permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). To survive a Rule 12(b)(6) motion, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (citation and brackets omitted). Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law. *Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007). The Court of Appeals for the Sixth Circuit recently confirmed, after a challenge, that this is indeed the governing standard for Title IX claims as well as other claims. *See Doe v. Miami Univ.*, 882 F.3d 579, 588-589 (6th Cir. 2018) (rejecting the reduced pleading standard in Title IX cases enunciated by the Court of Appeals for the Second Circuit).

In deciding a motion to dismiss, the court is not required to accept summary allegations, legal conclusions, or unwarranted factual inferences. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999); *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996). Nor is the court required to accept as true allegations that are contradicted by documents that have been

9

incorporated by reference in the complaint. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012).

As a general rule, "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under [Federal Rule of Civil Procedure] 56." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The term "pleadings" encompasses both the complaint and the answer, Fed. R. Civ. P. 7(a), and a copy of any exhibit thereto. Fed. R. Civ. P. 10(c). However, "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are "integral to the claims" in deciding motion to dismiss); *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (noting that in deciding a motion to dismiss "the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice"). In short, "if both parties reference and quote extensively from particular documents, and neither party contests the appropriateness of considering the documents on review of a motion to dismiss, the Court may consider the documents." *Doe v. Ohio St. Univ.*, 219 F. Supp. 3d 645, 653 (S.D. Ohio 2016) (citing *In re Fair Fin. Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016)).

Defendants attached the 2016-2017 Handbook to their Motion. (*See* Doc. No. 40-1.) This is the version relevant to this case. Plaintiff does not contest the authenticity of the Handbook (*see* Doc. No. 42), the Handbook has been expressly and extensively referenced in the Complaint, and

the Handbook is integral to Plaintiff's claims. Accordingly, the Court considers this document in its entirety for purposes of the pending motion to dismiss.

## IV.    ANALYSIS

"There has been much debate in recent times about the most effective method for addressing the formidable problem of sexual assault on college campuses. College administrators, politicians, academics and students alike have clashed on how best to balance the interests and rights of complainants with those of the accused." *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). The Court, however, has a limited role to play. Particularly at the motion to dismiss stage, "this case comes before the Court in limited posture." *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) (hereinafter "*Univ. of the South I*"). Because Plaintiff's claims against Vanderbilt are grounded upon the manner in which the university conducted the process leading to its conclusion that he had violated the Sexual Misconduct Policy and the resulting imposition of sanctions, the Court's review is "substantially circumscribed" – namely, "the law does not allow th[e] Court to retry the University's disciplinary proceeding." *Id.* (quoting *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 14 (D. Maine 2005)); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 899 (M.D. Tenn. 2018) (same); *see also Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."); *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *4 (E.D. Pa. Nov. 24, 2017) ("In reviewing [the university's] proceedings, we may not "advocate for best practices nor [...] retry disciplinary proceedings.") (quoting *Yu*, 97 F. Supp. 3d at 461).

Furthermore, this is not a lawsuit between Plaintiff and Jane Roe. Accordingly, the Court is not asked to make an independent determination as to what happened between Plaintiff and Jane

Roe on February 10, 2017. "The Court therefore expresses no opinion as to whether [a violation of the Sexual Misconduct Policy] occurred, whether any such acts were consensual, or who, as between [Plaintiff] and [Jane Roe] is credible." *Univ. of the South I*, 687 F. Supp. 2d at 755; *see also Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) (noting that "the issue before this Court is not whether the [university] should have believed a certain party's version of events") (hereinafter "*Pierre*"); *Yu*, 97 F. Supp. 3d at 461 (explaining that the Court's role is only to determine if the school discriminated against the plaintiff under federal law or otherwise violated a provision of state law when it expelled him for sexually assaulting a fellow student). The Court only evaluates factual discrepancies to the extent they go to questions regarding the nature of the investigation, rather than the quality of the outcome. *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011) (hereinafter "*Univ. of the South II*").

### A. Title IX Claims

Title IX was enacted to supplement the ban on discrimination in the Civil Rights Act of 1964, and it is designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. *Bonnell v. Lorenzo*, 241 F.3d 800, 810 n.6 (6th Cir. 2001); *Schaumleffel v. Muskingum Univ.*, Case No. 2:17-cv-463, 2018 WL 1173043, at *12 (S.D. Ohio Mar. 6, 2018). Title IX states that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance...." 20 U.S.C. § 1681(a). It is beyond cavil that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). While the Court of Appeals has noted that "[e]ducation is a university's first priority [and] adjudication of student

12

disputes is, at best, a distant second," *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) (citing *Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88 (1978)), regulations require educational institutions to implement "grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [Title IX]." 34 C.F.R. § 106.8(b). Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available.[5] *Klemencic v. Ohio St. Univ.*, 263 F.3d 504, 510 (6th Cir. 2001).

In *Miami University*, the Court of Appeals explicitly adopted for the first time in a published opinion the analytical framework set forth by the Second Circuit in *Yusuf* for determining whether a plaintiff is able to demonstrate that intentional gender discrimination occurred in connection with a university disciplinary proceeding. As a result, the Court of Appeals recognizes at least four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias can potentially assert under Title IX. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citing *Yusuf*, 35 F.3d at 715). These theories are: (1) "erroneous outcome"; (2) "selective enforcement"; (3) "deliberate indifference"; and (4) "archaic assumptions." *Id*. at 589 (citing *Yusuf*, 35 F.3d at 715; *Doe v. Cummins*, 662 F. Appx. 437, 451-52 & n.9 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003)). Plaintiff attempts to bring claims on three bases: (1) erroneous outcome; (2) selective enforcement; and (3) deliberate indifference; Vanderbilt contends Plaintiff does not plausibly allege any theory.

### 1. Erroneous Outcome

Plaintiff pleads the erroneous outcome theory of Title IX liability, based broadly on allegations that the EAD's findings and the outcome of Plaintiff's appeal "can only be explained

---

[5] There is no dispute that Vanderbilt is an educational institutional voluntarily participating in federal programs and, thus, under the ambit of Title IX.

by gender bias against males in cases involving allegations of sexual assault." (Doc. No. 35 ¶¶ 156-167). "In a typical erroneous outcome case, the plaintiff 'attack[s the] university disciplinary proceeding on grounds of gender bias' by arguing that the plaintiff 'was innocent and wrongly found to have committed an offense.'" *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 777-78 (S.D. Ohio 2015) (quoting *Yusuf*, 35 F.3d at 715); *see also Saravanan*, 2017 WL 5659821, at *4 (same). To plead an erroneous outcome claim, a plaintiff must allege two things: "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (2) a particularized ... causal connection between the flawed outcome and gender bias." *Miami Univ.*, 882 F.3d at 592 (quoting *Cummins*, 662 F. App'x at 452 (internal quotation marks and citation omitted)); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (same); *see also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) (noting a plaintiff must allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding").

The pleading burden as to the first element – articulable doubt – is "not heavy" and can normally be met by alleging "particular procedural flaws affecting the proof." *See Yusuf*, 35 F.3d at 715. The second element, however, requires significantly more. A plaintiff may satisfactorily plead a causal connection between a flawed outcome and gender bias by alleging "inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Miami Univ.*, 882 F.3d at 593 (quoting *Yusuf*, 35 F.3d at 715); *Saravanan*, 2017 WL 5659821, at *4. Stated differently, a Title IX plaintiff successfully alleges gender bias for purposes of this claim "if he or she points to statistical evidence of gender bias in [a u]niversity's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials

evidencing gender bias." *Marymount Univ.*, 297 F. Supp. 3d at 585 (citing *Cummins*, 662 F. App'x at 452).

Accordingly, courts must look with a critical eye to determine whether a plaintiff plausibly alleges the required causal connection – i.e., particular circumstances suggesting that gender bias was a motivating factor behind a university's allegedly erroneous outcome – as opposed to merely making untethered, vague, or conclusory allegations of discrimination. "[C]onclusory allegations of gender bias, unsupported by even minimal data, credible anecdotal references, or the purported presence of specific external pressures, are insufficient to support a plausible erroneous outcome claim." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 682 (M.D. Tenn. 2018). Further, when courts consider allegations of external pressure, they look to see if a plaintiff has alleged facts demonstrating that it was pressure not only to "aggressively pursue sexual assault cases, but to do so in a manner biased against males." *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017). This takes into account that "a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct ... does not equate to gender bias because sexual assault victims can be both male and female." *Sahm*, 110 F. Supp. 3d at 778.

Here, Plaintiff claims that the facts alleged in the Second Amended Complaint "cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and that the "EAD's erroneous finding was the product of disparate treatment of [Plaintiff] on the basis of his gender." (Doc. No. 35 ¶¶ 157-158). Plaintiff further alleges that (1) "Molly Zlock is openly biased against accused males"; (2) "upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at Vanderbilt, the accused student is male and the accusing student is female"; and (3) that Vanderbilt "has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX." (*Id.* at ¶¶ 158, 160).

Additionally, Plaintiff makes allegations that (1) "acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in the University's loss of federal funding"; (2) "[t]here could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student"; (3) "the University officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles"; (4) "these officials also focus on what would be most expedient for the University and, in particular, avoiding publicity that could harm the University's image and brand, and hinder its efforts to attract tuition-paying students. The safer course for these officials is to convict all accused male students"; and (5) "the University officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called 'campus rape culture' at the expense of the individual rights of the accused male students." (*Id.* at ¶¶ 160-164).

The Court need not delve into the first element – i.e., allegations that cast "some articulable doubt" on the outcome of the disciplinary proceeding – because it concludes that Plaintiff's failure to sufficiently plead the second element of the erroneous outcome claim is outcome determinative. Plaintiff has neither alleged any statistics, patterns, or anecdotal evidence showing gender bias in reporting, investigation, or punishment under Vanderbilt's Sexual Misconduct Policy, nor alleged any policy or practice designed to produce gender-specific outcomes. Absent any allegation to the contrary, "[t]he gender of [ ] students accused of sexual assault is the result of what is reported to [Vanderbilt], and not the other way around." *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 92 (1st Cir. 2018); *see also Doe v. Univ. of Dayton*, 766 F. App'x 275, 282 (6th Cir. 2019) (finding Doe's

allegation that, "[u]pon information and belief, in virtually all cases of campus sexual misconduct by Dayton [sic], the accused student is male and the accusing student is female" was "not in and of itself sufficient to infer gender bias" and "d[id] not suffice to allege a particularized causal connection between gender bias and Doe's suspension.").

Nor has Plaintiff plead any facts that the members who participated in his disciplinary process made statements, prior to or during the process, that would suggest they had gender bias. The Second Amended Complaint alleges Vanderbilt's current Title IX Coordinator, Molly Zlock, "is openly biased against accused males." (Doc. No. 35 ¶ 158). However, nowhere does the Second Amended Complaint allege that Zlock participated or was otherwise involved in Plaintiff's disciplinary process – indeed, the Second Amended Complaint acknowledges that Zlock was not even hired by Vanderbilt until after EAD's investigation and final determination. (*Id*. at ¶¶ 11, 20-21, 45-50). The alleged bias of Zlock, who did not play a role in EAD's investigation or determination of Plaintiff's disciplinary proceeding, is insufficient to support an inference that gender bias was a motivating factor behind the allegedly erroneous outcome in Plaintiff's case. *Cf. Doe v. Case W. Reserve Univ.*, No. 1:17-cv-414, 2017 WL 3840418, at *6–7 (N.D. Ohio Sept. 1, 2017) (stating that allegations of bias on the part of the Title IX coordinator who exercised control over the evidence presented to the decisionmaker was sufficient to support erroneous outcome claim at the dismissal stage).

Plaintiff has also not alleged any language in the Handbook that would suggest that gender bias played a role in the outcome of EAD's investigation, the Director of Student Accountability's sanction, or Plaintiff's appeal. Indeed, throughout the Sexual Misconduct Policy, complainants and respondents are carefully referred to as "he or she or they," indicating that Vanderbilt believes that men and women can both be victims and perpetrators. (*See* Doc. No. 40-1.) Most of Plaintiff's

general allegations simply reflect dissatisfaction with the outcome of his particular case. A single case of an individual who is subjectively displeased with the result of a disciplinary proceeding, however, cannot constitute a "pattern of decision-making" that makes plausible an erroneous outcome claim. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003); *Yusuf*, 35 F.3d at 715; *Schaumleffel v. Muskingum Univ.*, Case No. 2:17-cv-463, 2018 WL 1173043, at *15 (S.D. Ohio Mar. 6, 2018). Without more, Plaintiff's erroneous outcome claim may not proceed. *See Doe v. Cummins*, 662 F. Appx. 437, 452 (6th Cir. 2016) ("Alleged procedural deficiencies, without alleging additional facts linking the procedural defects to gender bias, do not create a plausible inference of gender discrimination."); *Yusuf*, 35 F.3d at 715 ("Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.").

The Second Amended Complaint makes no allegations about past or present lawsuits, outside investigations, or government pressure on Vanderbilt to modify its treatment of male versus female students in the Sexual Misconduct Policy disciplinary process. Plaintiff's allegations that "acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights *could* institute an investigation that would result in the University's loss of federal funding" and that "[t]here *could* also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student" ,(Doc. No. 35 ¶ 161 (emphasis added)), do not salvage his erroneous outcome claim. "[I]t is not reasonable to infer that [a university] has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016). Furthermore, while the Sixth Circuit has recognized that being investigated by the federal government for potential Title IX

18

violations is a relevant allegation suggesting that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault. *Cummins*, 662 Fed.Appx. at 453. It has also recently made clear that external pressure alone is not enough; rather, external pressure "combined with other circumstantial evidence of bias in [a complainant's] specific proceeding" is what makes a claim plausible. *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). In sum, even accepting Plaintiff's allegations as true, there is nothing to suggest here that there was anything in the way of external pressure that would support a particularized causal connection between a flawed outcome in Plaintiff's case.

### 2. Selective Enforcement Claim

Plaintiff also brings a Title IX claim under the theory of "selective enforcement." (Doc. No. 35 ¶¶ 168-170). In a selective enforcement claim, "a plaintiff essentially asserts that even if he or she did violate a university policy, the decision to initiate disciplinary proceedings or the severity of the penalty imposed was motivated by gender bias." *Marshall v. Ohio Univ.*, Case No. 2:15-cv-775, 2015 WL 7254213, at *6 (S.D. Ohio Nov. 17, 2015) (citing Yusuf, 35 F.3d at 715). "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 F. App'x at 452; *see also Mallory*, 76 F. App'x at 641 ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [u]niversity."); *Marshall*, 2015 WL 7254213, at *6 (under the selective enforcement theory, a plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably" by the university and that the difference in treatment was due to gender).

Under the heading of this claim, Plaintiff alleges that "regardless of [his] guilt or innocence" the "severity of the penalty levied against him (expulsion)" and the "decision to initiate the proceeding against him" were "affected by his gender." (Doc. No. 35 ¶¶ 169-170).

The Court finds that Plaintiff "has failed to allege that any female student was not disciplined by [Vanderbilt] after a complaint was filed similar to the allegations made [by Jane Roe] against [Plaintiff] in this case." *Schaumleffel*, 2018 WL 1173043, at *17; *see also Univ. of the South I*, 687 F.Supp.2d at 757 (finding plaintiff had failed to plead that a similarly situated woman would not have been subjected to the same disciplinary proceedings). Plaintiff has neither alleged that he has been treated less fairly than a female student charged with similar violations of the Sexual Misconduct Policy, nor compared the penalty imposed upon him for violating the Sexual Misconduct Policy (or any Vanderbilt policy, for that matter) to the punishment imposed upon any female student for violating any Vanderbilt policy. *See Marshall*, 2015 WL 7254213, at *7 (explaining that the plaintiff should have compared the penalty imposed upon him for violating the policy to the punishment imposed upon a female student for violating the policy).

In short, Plaintiff has not alleged that he was unfairly investigated or disciplined where similarly-situated females facing disciplinary charges were not. As a result, Plaintiff's selective enforcement claim may not proceed. *Doe v. Cummins*, 662 F. Appx. 437, 452 (6th Cir. 2016); *see also Schaumleffel*, 2018 WL 1173043, at *17 (selective enforcement claim dismissed because it did not assert that any other female student was not appropriately disciplined after being subject to a similar complaint); *Univ. of Dayton*, 2018 WL 1393894, at *10 (finding selective enforcement claim "inapplicable" because the plaintiff failed to allege that similarly-situated females were treated more favorably than him); *Marshall*, 2015 WL 7254213, at *6 (dismissing selective enforcement claim on grounds that plaintiff (1) "never allege[d] facts about a single instance when

20

[the university] declined to investigate allegations that a similarly situated female violated the policy" and (2) did not allege that the university decided to investigate the victim's allegations about the plaintiff because the plaintiff was male and that the university would not have investigated the university's allegations if the plaintiff was female).

### 3. Deliberate Indifference Claim

To bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment.[6] *Doe v. Miami Univ.*, 882 F.3d 579, 591 (6th Cir. 2018) (citing *Mallory*, 76 F. App'x at 638-39; *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691-93 (6th Cir. 2000); *Univ. of the South I*, 687 F. Supp. 2d at 758; *see also Baum*, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); *Schaumleffel*, 2018 WL 1173043, at *14 ("The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment."). Furthermore, a deliberate indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Miami Univ.*, 882 F.3d at 590 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) and citing *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009)); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (same); *Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (same). Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough. *See Miami Univ.*, 882

---

[6] In addition, a plaintiff must plead that "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to," the alleged misconduct. *Miami Univ.*, 882 F.3d at 590 (quoting *Mallory*, 76 F. App'x at 638). Finally, a plaintiff must meet the high bar of alleging that a university's response to the alleged harassment was "clearly unreasonable in light of the known circumstances." *Univ. of the South I*, 687 F. Supp. 2d at 757 (quoting *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009)); *Adams v. Ohio Univ.*, 300 F. Supp. 3d 983, 995-1000 (S.D. Ohio 2018) (same).

F.3d at 591; *Carmichael v. Galbraith*, 574 F. App'x 286, 289-90 (5th Cir. 2014); *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 270 (D. Mass. 2018). Alleged sexual harassment in the form of a failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011).

Accordingly, to plead a Title IX deliberate indifference claim, the misconduct Plaintiff alleges "must be sexual harassment, not just a biased disciplinary process." *Baum*, 903 F.3d at 588 (quoting *Miami Univ.*, 882 F.3d at 591); *Univ. of Dayton*, 2018 WL 1393894, at *8 (rejecting argument that plaintiff alleged a deliberate indifference claim based solely on the gender discrimination he asserted occurred throughout the disciplinary process). Plaintiff, however, alleges only bias relating to Vanderbilt's treatment of him during the disciplinary process. Plaintiff has not alleged that he was sexually harassed, by Jane Roe, Vanderbilt employees, or anyone else, before or during Vanderbilt's disciplinary proceedings. Plaintiff 's deliberate indifference claim therefore "fails because the alleged gender discrimination is not tethered to a claim of sexual harassment." *Miami Univ.*, 882 F.3d at 591; *see also Baum*, 903 F.3d at 588 (concluding the same because the plaintiff "did not allege that actionable sexual harassment occurred during his disciplinary proceedings"); *Doe v. Ohio St. Univ.*, 323 F. Supp. 3d 962, 968 (S.D. Ohio 2018) (dismissing deliberate indifference claim because "[p]laintiff ha[d] not alleged that he complained to [the university] that he was being sexually harassed, nor is there any allegation that [the university] ignored his complaints of sexual harassment"); *Schaumleffel*, 2018 WL 1173043, at *15 (reaching same conclusion because the plaintiff's claims were based not on sexual harassment but on "the alleged gender discrimination that occurred throughout his disciplinary process");

22

*Univ. of Dayton*, 2018 WL 1393894, at *8 (dismissing deliberate indifference claim because the plaintiff only asserted that he suffered discrimination, not sexual harassment, "throughout the disciplinary process").

## B. Declaratory Judgment Claim

Plaintiff brings a cause of action for a declaratory judgment concerning alleged violations of Title IX. (Doc. No. 35 ¶¶ 148-152). The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has indicated that this act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). In passing the act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id*. at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." *Id*. at 289. In considering whether a district court has properly exercised its discretion in this regard, the Court of Appeals has traditionally focused on five factors:

> (1) whether the declaratory action would settle the controversy;
>
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
>
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
>
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

23

(5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984). Here, the third and fourth *Grand Trunk* factors have no particular relevance, but the first, second, and fifth factors counsel against exercising jurisdiction to invoke declaratory jurisdiction. Because the Court has found that Plaintiff has failed to state any claim for violation of his rights, there exists no continuing controversy between Plaintiff and Vanderbilt to be settled and no justifiable basis for the issuance of a declaratory judgment at a later stage of this case. Further, addressing the question of whether Vanderbilt's policies or procedures might violate federal compliance obligations would not serve a useful purpose in clarifying the relationship between Plaintiff and Vanderbilt. *See Univ. of the South I*, 687 F. Supp. 2d at 760. The Court will therefore not exercise jurisdiction and dismiss Plaintiff's declaratory judgment claim. *See, e.g., Marshall v. Ohio Univ.*, Case No. 2:15-cv-775, 2015 WL 7254213, at *13 (S.D. Ohio Nov. 17, 2015) (dismissing declaratory judgment claim because "[w]ithout an actionable [Title IX] claim, there is no controversy to be settled").

### C. Breach of Contract Claims

Plaintiff alleges that a contractual relationship existed between Vanderbilt and himself by virtue of his paying tuition. Plaintiff claims that the relevant terms of the parties' contract are set forth in the Student Handbook, and that Vanderbilt breached these terms when it failed to provide Plaintiff with a fair adjudicatory process in a number of ways.

In Tennessee, to allege a breach of contract a plaintiff must plead (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach. *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 828 (M.D. Tenn. 2014).

The Tennessee Supreme Court "has not ... enunciated the standard which should be applied in a dispute arising out of the university-student relationship." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988). However, noting that courts "have rejected a rigid application of contract law in this area," the Court of Appeals for the Sixth Circuit, applying Tennessee law, has reaffirmed that "the student-university relationship is contractual in nature." *Sifuna v. S. Coll. of Tenn., Inc.*, No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018); *see also Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) (explaining that provisions of university's student handbook may be enforced in Tennessee as an implied contract); *Doherty*, 862 F.2d at 577 (describing student-university relationship as "contractual in nature"). Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship. *Atria*, 142 F. App'x at 255. And, indeed, the Court of Appeals has in the past specifically held that Vanderbilt's own Handbook creates implied contractual obligations. *See id.* (concluding that Vanderbilt's Handbook, "which states that its policies 'are not intended to be all-inclusive and do not constitute a contract,' is not an express written contract," but the Handbook's provisions may be enforced as an implied contract).

Accordingly, "a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011). Here, the Court utilizes the Handbook and Sexual Misconduct Policy to define the relevant terms of the implied contractual relationship between Plaintiff and Vanderbilt. *Atria*, 142 F. App'x at 255; *Anderson*, 450 F. App'x at 502; *see also Univ. of the South II*, 2011 WL 1258104, at *18 (explaining that university's sexual assault policies and procedures could be enforced as implied contract); *Doe v. Colgate Univ.*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *19 (N.D.N.Y. Oct. 31, 2017) (under similar contract

25

law, treating student handbook and university grievance policy as containing terms of the agreement between student plaintiff and university). However, the provisions therein "have unique qualities and must be construed to allow the [university's] governing body to meet its educational and doctrinal responsibilities," *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011), and, as mentioned, it is not the role of the Court to "advocate for best practices," *Yu*, 97 F.Supp.3d at 461.

Plaintiff alleges numerous grounds for breach of his contractual relationship with Vanderbilt arising from the university's investigation and disciplinary action under the Sexual Misconduct Policy.

### 1. Appropriateness of Investigation

Plaintiff alleges that Vanderbilt failed to conduct an appropriate investigation. (Doc. No. 35 ¶¶ 73-87). However, the Sexual Misconduct Policy contains few requirements regarding how the EAD must conduct an appropriate substantive investigation, including no specific requirements regarding how the EAD must utilize, evaluate, and accept or reject testimony or other evidence.

Instead, the Sexual Misconduct Policy only requires that an investigation be conducted in the broadest sense. In most relevant part, the Sexual Misconduct Policy specifically requires that EAD investigators interview the respondent and other individuals that EAD determines may have pertinent knowledge. (Doc. No. 40-1 at 117). At the end of EAD's investigation, it shall: (1) prepare a preliminary investigation report that contains a summary of the information and documents that EAD considers relevant to whether the respondent violated the Sexual Misconduct Policy; and, subsequently, (2) issue a final investigative report that sets forth EAD's final determination, based on a preponderance of the evidence standard, regarding whether the respondent violated the Sexual Misconduct Policy by engaging in any of the prohibited offenses, including "a summary of the

information and documents on which it is based" and addressing "to the extent EAD considers appropriate," any comments received from the complainant or respondent. (*Id*. at 117-118). The Appellate Officers are merely required to consider the appeal based only on the materials presented to the EAD or new information introduced in certain limited circumstances. (*Id*. at 121-123).

Here, Doe clearly alleges that Vanderbilt conducted an investigation, interviewed witnesses (including John Doe and Jane Roe), and produced investigation reports that provided explanations of EAD's consideration of the evidence, witnesses' credibility, and factual conclusions related thereto. (Doc. No. 35 ¶¶ 20-21, 25, 42-46, 85-87, 100). Plaintiff further alleges that he was allowed to appeal and submit his arguments in writing. (*Id*. at ¶¶ 47-48).

While Doe is dissatisfied with the result of the investigation, this is an insufficient basis for a breach of contract claim. *See, e.g.*, *Schaumleffel v. Muskingum Univ.*, Case No. 2:17-cv-463, 2018 WL 1173043, at *11 (S.D. Ohio Mar. 6, 2018) ("The Student Handbook does not contain specific requirements regarding the investigation following a complaint against a student. [The university] conducted an investigation into the allegations and prepared a report. Those actions are sufficient under the Student Handbook."); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 893-95 (M.D. Tenn. 2018) (dismissing breach of contract claim alleging an inadequate investigation where policy merely stated that investigators will determine whether collected information is relevant); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 891-92 (N.D. Ohio 2017) (dismissing breach of contract claim based on appropriateness of investigation because complaint did not allege that student handbook contained controlling, specific requirements concerning means of investigation); *see also, e.g.*, *Powell v. St. Joseph's Univ.*, Civil Action No. 17-4438, 2018 WL 994478, at *5 (E.D. Pa. Feb. 20, 2018) (holding students are only entitled to those safeguards that a school specifically provides in its procedures); *Doe v. Columbia Coll. Chicago*, Case No. 17-CV-00748,

27

2018 WL 497284, at *7 (N.D. Ill. Jan. 22, 2018) (breach of contract claim regarding inadequate investigation failed where school met with and communicated with both complainant and respondent throughout the investigation, gathered facts and witnesses, considered the evidence provided and the credibility of the parties, and created an investigation report); *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 813 (E.D. Pa. 2017) (concluding that the promise of a "thorough and fair investigation" did not impose any addition requirements other than those specifically set forth in the student disciplinary procedures); *Dempsey v. Bucknell Univ.*, Civil Action No. 4:11-CV-1679, 2012 WL 1569826, at *18 (M.D. Pa. May 3, 2012) (holding that student's breach of contract claim failed where complaint demonstrated that an investigation into the assault complaint was conducted).

### 2. Right to Counsel

Plaintiff alleges that Vanderbilt denied him a "meaningful right to counsel." (Doc. No. 35 ¶¶ 88-92). The Second Amended Complaint states that "[t]he notion of a student being able to defend himself competently in the immensely emotional situation Doe found himself is absurd. Doe was intimidated, as any innocent student accused of sexual assault would have been, and could not have been expected to prepare and deliver his version of the facts in a coherent and logical manner. Doe should have been encouraged to go through the investigation process with counsel." (*Id*. at ¶ 92).

Here, the Second Amended Complaint acknowledges that Vanderbilt's Sexual Misconduct Policy permitted Plaintiff to select an advisor of his choosing, including an attorney or legal counsel. (*Id*. at ¶ 88). The Second Amended Complaint further acknowledges that, although an advisor may not speak on behalf of the complainant or respondent or otherwise participate in any meeting, the advisor is permitted to privately confer with the student. (*Id*. at ¶ 91). So Plaintiff was

able to have counsel present and to consult with counsel outside of the formal investigative setting. This is more counsel than even necessary, because "it is well established that colleges and universities need not allow active representation [of students in disciplinary proceedings] by legal counsel ... in order to comply with notions of fairness." *Coll. of Wooster*, 243 F. Supp. 3d at 894 (dismissing breach of contract claim, where complaint alleged that "[t]he notion of a young man being able to defend himself competently in this intensely emotional situation is absurd," because student handbook limited participation of counsel); *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) ("Ordinarily, colleges and universities need not allow active representation by legal counsel or some other sort of campus advocate."). This is not, therefore, a plausible basis for a breach of contract claim.

### 3. Competency and Bias of Investigators and Appellate Officers

Plaintiff alleges that the EAD, specifically Damian P. Marshall, and the Appellate Officers were incompetent and biased. (Doc. No. 35 ¶¶ 93-96, 106-107). This is based on Plaintiff's wholly speculative and conclusory "belief" that those individuals did not have "any training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting." (*Id.* at ¶¶ 96, 106). Regarding the Appellate Officers in particular, Plaintiff avers that "[d]espite the absence of any relevant training, the appellate officers were somehow able to conclude that no procedural errors, evidence of bias, relevant information, or excessive severity had impacted or would impact the ultimate outcome and sanctions in Doe's case." (*Id.* at ¶ 107.)

As to competency, Vanderbilt's Sexual Misconduct Policy does not dictate any credentials the EAD staff, investigators, or Title IX Coordinator, must possess aside from receiving training "at least annually, and on an ongoing basis, on issues related to sexual harassment, sexual

29

Case 3:18-cv-00569   Document 44   Filed 09/30/19   Page 29 of 46 PageID #: 1108

misconduct, and intimate partner violence, and in in conducting investigations in a manner that protects the well-being and safety of the complainant, the respondent, and the University community." (Doc. No. 40-1 at 125). The Sexual Misconduct Policy states that "Appellate Officers will be faculty and/or administrators appointed by the Chancellor (or the Chancellor's designee) for two- or three- years terms, who will receive annual training on issues involved in sexual misconduct, such as relevant evidence, the appeals process, standards of review, and avoiding actual or perceived conflicts of interest." (*Id*. at 121-122).

The Second Amended Complaint is insufficient because it does not make any specific allegations about the backgrounds or lack of training of Damian P. Marshall or any of the Appellate Officers. *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 896 (M.D. Tenn. 2018) (citing *Powell v. St. Joseph's Univ.*, Civil Action No. 17-4438, 2018 WL 994478, at *5 (E.D. Pa. Feb. 20, 2018) (where policy only required professionally trained investigators, dismissing breach of contract claim because complaint alleged nothing about backgrounds of investigators)). Plaintiff cannot bring suit under a unilaterally-imposed higher bar than Vanderbilt's Sexual Misconduct Policy. *See id.* (citing *Colgate Univ.*, 2017 WL 4990629, at *19 (finding breach of contract argument failed where student handbook required nothing more than "annual training")).

Plaintiff also alleges that the EAD, particularly Damian P. Marshall, were biased. (Doc. No. 35 ¶¶ 93-96, 84-87). As to bias, "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of <u>actual bias</u>." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 696 (M.D. Tenn. 2018) (emphasis in original) (quoting *Atria*, 142 F. App'x at 256). To overcome that presumption, Plaintiff must plausibly allege "personal animosity, illegal prejudice, or a personal or financial stake in the outcome" on the part of the EAD. *Id.* (quoting *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985) and citing *Doe v. Cummins*,

662 F. Appx. 437, 450 (6th Cir. 2016) (stating that, to survive a motion to dismiss, allegations of bias must be "evident from the record and cannot be based on speculation or inference") and *Doe v. Ohio St. Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016) ("To survive a motion to dismiss, [the plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias."). Stated differently, a "mere belief that [university officials] acted with ... ulterior motives" during the course of the investigation "is insufficient to state a claim for relief." *Id.* (quoting *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016)).

The Court will not "indulge in unreasonable inferences" concerning alleged bias. *Cummins*, 662 F. App'x at 454. Plaintiff has not alleged facts of any specificity to plead "actual bias," and the speculative allegations of prejudgment and purported bias, without factual support, fail to clear the required hurdle to sustain a breach of contract claim. *See Belmont Univ.*, 334 F. Supp. 3d at 895-97 (concluding same where plaintiff alleged biased university officials were determined to punish him); *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 777 (N.D. Ind. 2017) (holding that alleged procedural deficiencies or a plaintiff's conclusory disagreement with university's substantive determinations are, alone, not a basis to impute bias based on gender) (citing *Cummins*, 662 F. App'x at 452)).

### 4. Cross-Examination

Plaintiff alleges that he was prevented from cross-examining Jane Roe or any other relevant parties. (Doc. No. 35 ¶¶ 97-100). However, the Second Amended Complaint does not allege that the Sexual Misconduct Policy requires a complainant to appear and be cross-examined by a respondent, and, indeed, there is no such requirement. Under the Sexual Misconduct Policy, EAD's determination of responsibility is made without a hearing, precluding an opportunity for cross-examination of witnesses. (*Id.* at ¶ 97). Thus, the implied contractual relationship between Plaintiff

and Vanderbilt does not provide for the right to confrontation that Plaintiff alleges that he was denied. The Court has previously recognized that a different result regarding the viability of this claim would likely arise in the context of a procedural due process claim against a public university. *See Belmont Univ.*, 334 F. Supp. 3d at 893-95 (citing *Baum*, 903 F.3d at 582-584 (holding that, if a public university has to choose between competing narratives to resolve a sexual misconduct case, the university must give the accused student or his agent some opportunity to cross-examine the accuser in the presence of a neutral fact-finder)); *Univ. of Cincinnati*, 872 F.3d at 400-404 (6th Cir. 2017) (holding that a respondent facing suspension was entitled to cross-examination where the university was deciding between competing narratives and making a judgment as to the credibility of the accuser)). However, Vanderbilt is a private university and Plaintiff brings a breach of contract claim. The Court therefore does not resolve questions of constitutional due process. *Belmont Univ.*, 334 F. Supp. 3d at 893-95 (reaching same result in action against private university). At present, this is not a sufficient basis for Plaintiff's breach of contract claim.

### 5. Sufficiency of Evidence

Plaintiff appears to allege that there was insufficient evidence for Vanderbilt to find that he committed sexual assault-intercourse, sexual assault-contact, and dating violence because, in addition to finding the incident became nonconsensual from the point at which Plaintiff choked Jane Roe, the EAD also found "that if Jane Roe was intoxicated to the point of incapacitation, [Doe] did not know and/or reasonably would not have known that she was incapacitated." (Doc. No. 35 ¶¶ 42-44, 101-103).

As the Sixth Circuit has explained, absent a credible allegation that the university "failed to comply with relevant procedural requirements, [the court should] decline to construe the [ ]

Handbook as requiring a particular outcome" based on the evidence. *Anderson*, 450 F. App'x at 502; *see also Univ. of the South I*, 687 F. Supp. 2d at 755 (stating that it is not for the courts to review "whether a sexual assault occurred, whether any such acts were consensual, or who, as between [respondent] and the [c]omplainant is credible"). Accordingly, Plaintiff's breach of contract claim may not proceed on the premise that Vanderbilt simply reached incorrect decisions.

**6. Promise of Fundamental Fairness and Covenant of Good Faith and Fair Dealing**

Finally, embedded throughout the breach of contract cause of action in the Second Amended Complaint are references to Vanderbilt's "promise of fundamental fairness and the implied covenant of good faith and fair dealing." (*See* Doc. No. 35 ¶¶ 71, 75, 89, 93, 96, 98, 99, 102, 109). Plaintiff broadly alleges that Vanderbilt has breached this promise of fundamental fairness, and its implied duty of good faith and fair dealing, in all the same ways that it breached the implied contractual relationship embodied in the Sexual Misconduct Policy.

In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003) (citing *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013).The nature of the duty "depends upon the individual contract in each case." *TSC Indus., Inc.*, 743 S.W.2d at 173. Tennessee courts have consistently applied this principle. *Dick Broad. Co.*, 395 S.W.3d at 661. To be clear, however, under Tennessee law a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but as a part of a breach of contract cause of action." *Univ. of the South II*, 2011 WL 1258104, at *18 (quoting *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000)); *see also Shah*, 338 F.3d at 572 ("Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief.").

33

Accordingly, the implied covenant of good faith and fair dealing creates a duty to provide basic fairness, and that duty can be met by complying with the terms of the Handbook generally, and the disciplinary process in the Sexual Misconduct Policy specifically, that are designed to be fair. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018) (citing *Univ. of the South II*, 2011 WL 1258104, at *18). The Court therefore views Plaintiff's "fundamental fairness" or implied covenant of good faith and fair dealing claim as essentially coextensive with Plaintiff's claims based on the express contractual promises rooted in the Sexual Misconduct Policy that is, itself, designed to be fair. Because the Court concludes that Plaintiff has not sufficiently alleged that Vanderbilt failed to perform the specific terms of that implied contract, it concludes that Plaintiff also does not adequately plead that Vanderbilt has breached the covenant of good faith and fair dealing or any other aspirational "fairness" duty. *See, e.g.*, *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 812 (E.D. Pa. 2017) (finding generic promise of "fairness" does not give rise to "fairness" procedural obligations independent of specific provisions in university's disciplinary procedures, which themselves describe procedures designed to be fair); *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996) ("Performance of a contract according to its terms cannot be characterized as bad faith in breach of the duty of good faith and fair dealing.").

In sum, Plaintiff has not articulated a sufficient basis for his breach of contract claims. Accordingly, they will be dismissed.

### D. Promissory Estoppel

Plaintiff also brings a claim for promissory estoppel. (Doc. No. 35 ¶¶ 112-116). In Tennessee, a claim for promissory estoppel has three elements: "(1) a party made a promise which the promisor should reasonably have expected to induce the action or forbearance of the promisee;

(2) the promise does induce that action or forbearance; and (3) injustice can be avoided only by enforcing the promise." *Sifuna*, 2018 WL 3005814, at *2 (citing *Atria*, 142 F. App'x at 256); *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citation omitted). The key element is the promise. *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). Tennessee does not liberally apply the doctrine of promissory estoppel and limits its application to exceptional cases "verging on actual fraud." *Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003); *Baliles v. Cities Serv.*, 578 S.W.2d 621 (Tenn. 1979).

As a general matter, recovery is not available under the theory of promissory estoppel when a valid contract exists between the parties. *Jones v. BAC Home Loans Servicing, LP*, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at *9 (Tenn. Ct. App. July 12, 2017); *Calabro v. Calabro*, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999) (citing *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 19-20 (Tenn. App. 1997)). However, Tennessee courts have upheld a claim for promissory estoppel despite the existence of an enforceable contract in limited cases where an alleged promise was made at the time of contracting and operated to expand, not to add to or vary the terms of a contract. *Thomas Energy Corp. v. Caterpillar Fin. Servs. Corp.*, No. E2014-00226-COA-R3-CV, 2014 WL 7366676, at *7 (Tenn. Ct. App. Dec. 26, 2014) (citing *Bill Brown Const. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 11-12 (Tenn. 1991) (upholding a claim for promissory estoppel when the insurer's agent's representations expanded the terms of an insurance contract)).

Plaintiff alleges that "the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of [Plaintiff]", Plaintiff relied on Vanderbilt's promises and representations when he "accepted the University's offer of admission

35

and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing", and that reliance was to his detriment. (Doc. No. 35 ¶¶ 112-113).

This promissory estoppel claim is not a viable alternative to Plaintiff's breach of contract claim. Plaintiff has not alleged any special situation "verging on actual fraud." Even more importantly, as discussed above, Plaintiff and Vanderbilt have a contractual relationship. Plaintiff has not alleged any special promise made to him that operated to expand the terms of the Handbook or Sexual Misconduct Policy. Rather, Plaintiff's promissory estoppel claim is premised on the same allegations that support his breach of contract claim. In short, Plaintiff's promissory estoppel claim fails because there is an enforceable contractual relationship between Plaintiff and Vanderbilt that Plaintiff does not allege was altered. *See Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 902-03 (M.D. Tenn. 2018) (reaching same conclusion as to general promissory estoppel claim where student alleged he matriculated and incurred tuition on the university's promises of fundamental fairness but was subjected to breaches of the university's obligations under sexual assault misconduct policy);[7] *Jones*, 2017 WL 2972218, at *10 (promissory estoppel claim is "not available" for the purpose of seeking "to change the terms of existing, valid contract"); *Thomas Energy Corp.*, 2014 WL 7366676, at *7 (plaintiff may not substitute promissory estoppel claim for breach of contract claim unless there is an additional promise that expands the terms of the contract between the parties).

---

[7] In *Belmont University*, the Court allowed a limited promissory estoppel claim to proceed based on only one specific promise that a university official was alleged to have made to the plaintiff concerning a term of the disciplinary process. *Belmont University*, 334 F. Supp. 3d at 902-03.

36

## E. Intentional Infliction of Emotional Distress

Plaintiff also brings a state law claim for intentional infliction of emotional distress. (Doc. No. 35 ¶¶ 118-120). In Tennessee, the tort of intentional infliction of emotional distress ("IIED") is synonymous with the tort of outrageous conduct. *Belmont Univ.*, 334 F. Supp. 3d at 902-03 (citing *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000). A Tennessee plaintiff must plead the following elements of an IIED claim: (1) intentional or reckless conduct; (2) conduct so outrageous that it is not tolerated by civilized society; and (3) conduct resulting in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." *Belmont Univ.*, 334 F. Supp. 3d at 903. The conduct must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977). As the Tennessee Supreme Court has explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted). Thus, first, the standard is not whether an aggrieved person (such as Plaintiff) considers a party's actions to have been outrageous, but whether a civilized society would find them so. And, second, a plaintiff must prove that the conduct is outrageous and utterly intolerable in character, not just in motive. *Belmont Univ.*, 334 F. Supp. 3d at 903-04. In this way, a plaintiff seeking damages for IIED must meet an "exacting standard." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999). Tennessee courts have limited recovery for IIED to mental injury that "is so

severe that no reasonable person would be expected to endure it." [8] *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

As the foregoing suggests, "[t]he standard for outrageous conduct is high, indeed," *Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004), and cases finding conduct sufficient to support an intentional infliction of emotional distress claim are "few and far between." *Finley v. Kelly*, 384 F. Supp. 3d 898, 912 (M.D. Tenn. 2019). Often cited in this regard is *Johnson v. Woman's Hosp.*, 527 S.W.2d 133 (Tenn. Ct. App. 1975) where a mother was shown her deceased premature baby in a gallon jar of formaldehyde; *Dunbar v. Strimas*, 632 S.W.2d 558 (Tenn.Ct.App.1981), where a mother (who had recently had a nervous breakdown) was told her infant daughter had been sexually abused and there was a large tear in her rectum where sperm cells were found, when, in fact, the child had suffered a "crib death," and *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747 (Tenn. Ct. App. 1991) where plaintiff was told that her film could not be developed when, in fact, it had been developed and nude photographs of plaintiff were shown to other employees and plaintiff's acquaintances.

Here, Plaintiff alleges that "Vanderbilt's actions, specifically, institutionalizing a suicidal student (Doe), releasing his protected educational records, and failing to notify his next of kin, are so outrageous that they are not tolerated in a civilized society." (Doc. No. 35 ¶ 119). With respect to Plaintiff's involuntary commitment, Vanderbilt notes that Tennessee Code Annotated Section 33-6-302 permits involuntary commitment to a medical facility only with a clinical diagnosis of mental illness or serious emotional disturbance and a severe impairment likely to result in serious harm to the person. (Doc. No. 40 at 21). Vanderbilt argues Plaintiff has not alleged any facts to suggest that his involuntary commitment did not comply with Tennessee law, and that Plaintiff's

---

[8] Trial courts have been empowered to "reasonably dismiss this legal theory as a matter of law." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

commitment does not qualify as outrageous if it complied with state law. (*Id.*). In response, Plaintiff asserts "[t]he most outrageous thing" is that Vanderbilt did not notify Plaintiff's parents that Plaintiff was suicidal or that he had been committed to a hospital. (Doc. No. 42 at 21). While it is certainly understandable that Plaintiff's parents would want to be made aware of these occurrences, even accepting Plaintiff's allegations as true, it is not shocking or outrageous that Vanderbilt did not disclose Plaintiff's protected health information to them. Plaintiff's insufficient intentional infliction of emotional distress claim will therefore be dismissed.

### F. Negligence *Per Se* Claims

To the extent Plaintiff intended to bring negligence *per se* claims based on Title IX and the Clery Act, those claims will also be dismissed.[9] Negligence *per se* is the doctrine that violation of a statute in itself establishes negligence. *See Martin v. Herzog*, 228 N.Y. 164, 167-68, 126 N.E. 814 (1920) (Cardozo, J.). Generally speaking, in Tennessee a claim of negligence per se requires a plaintiff to prove that the defendant: (1) violated a statute, ordinance, or regulation that requires or prohibits a particular act for the benefit of the plaintiff or the general public; (2) that the injured person was within the class of individuals the legislature intended to benefit and protect by enacting the statute, ordinance, or regulation; and (3) that the defendant's negligence was the proximate cause of the injured party's injury. *Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992). However, "[t]he negligence per se doctrine is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute." *Rains v. Bend of the River*, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003). To trigger the doctrine, the statute must establish a specific applicable standard of conduct. *Thomas & Assocs., Inc. v. Metro.*

---

[9] Plaintiff alleges under Count IV, which is labeled "Negligence", that "[t]he applicable standard of care is informed by the laws of Tennessee and by the requirements of Title IX and the Clery act." (Doc. No. 35 ¶ 123).

*Gov't of Nashville and Davidson Cty.*, No. M2001–00757–COA–R3–CV, 2003 WL 21302974, at *7 (Tenn. Ct. App. June 6, 2003); *see also Atria*, 142 F. App'x at 253 ("Under Tennessee law, only statutes that establish a standard of care may support a claim of negligence *per se*.").

### 1. Negligence *Per Se* Claim Based on Title IX

Plaintiff's negligence *per se* claim based on Title IX will be dismissed because, as discussed above, Plaintiff has failed to plausibly allege gender discrimination under Title IX, and it would be illogical for negligence *per se* liability premised on Title IX to exceed or circumvent the requirements of Title IX liability under federal law. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 703 (M.D. Tenn. 2018) (citing *Univ. of the South II*, 2011 WL 1258104, at *14; *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 2017 WL 4074547, at *11 (D.N.J. Sept. 13, 2017) (stating that a claim of negligence *per se* would be an impermissible "end-run" around the substantive requirements of Title IX); *Ross v. Univ. of Tulsa*, 2015 WL 4064754, at *3-*4 (N.D. Ok. July 2, 2015) (dismissing negligence *per se* claim "premised upon [university's] alleged violation of Title IX and its implementing regulations")).

### 2. Negligence *Per Se* Claim Based on the Clery Act

Plaintiff's negligence *per se* claim based upon the Clery Act will also be dismissed. The Clery Act explicitly states that it does not create a private right of action or a standard of care. *See* 20 U.S.C. § 1092(f)(14)(A) ("Nothing in this subsection may be construed to – (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care."). "Accordingly, the law is enforced by the United States Department of Education, not through litigation brought by individuals such as [Plaintiff]." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 703 (M.D. Tenn. 2018). Plaintiff cannot circumvent the lack of a Clery Act private right of action by re-characterizing the cause of action

as a state law negligence *per se* claim. *See id.* at 704 (citing *Univ. of the South II*, 2011 WL 1258104, at *14; *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)). Accordingly, Plaintiff's negligence *per se* claim for violation of the Clery Act fails as a matter of law.

### G. Negligence and Gross Negligence Claims

Under Tennessee law, to plead negligence a plaintiff must allege the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *Merhson v. HPT TA Props. Tr.*, No. M2018-00315-COA-R3-CV, 2018 WL 5793564, at *2 (Tenn. Ct. App. Nov. 5, 2018) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W. 3d 83, 89 (Tenn. 2000)). To plead gross negligence, a plaintiff must allege the elements of negligence, and also allege that the act in question was "done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Thrasher v. Riverbend Stables*, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *5 (Tenn. Ct. App. May 21, 2008) (quoting *Ruff v. Memphis Light, Gas, and Water Div.*, 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981)).

However, where the alleged "breach of duty" that a plaintiff alleges occurred is a breach of contractual obligations, whether or not the defendant was negligent in attempting performance, "the action remains in contract." *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (dismissing negligence claims because alleged damages arose from breach of contractual relationship and stating "the alleged claim for negligence sounds in contract, and dismissal was proper"); *see also Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980) ("[I]t matters not a whit whether the breach was an intentional one

or an unintentional one caused by negligence in attempting to perform. The action still remains in contract."); *America's Collectibles Network, Inc. v. Sterling Commerce (America), Inc.*, 2016 WL 9132294, at \*19 (E.D. Tenn. Sept. 7, 2016) ("Under Tennessee law ... [w]here the only duty alleged arises from a contractual obligation, its breach cannot form the basis of a parallel negligence claim."); *Williams v. SunTrust Mort., Inc.*, No. 3:12-CV-477, 2013 WL 1209623, at \*4 (E.D. Tenn. Mar. 25, 2013) ("[W]hen two parties enter into a contractual agreement, their obligations to each other arise out of the contract itself, so that a violation of the contractual duty supports an action in contract rather than in tort.") (citing *Permobil, Inc. v. Am. Express Travel Related Servs., Inc.*, 571 F. Supp. 2d 825, 842 (M.D. Tenn. 2008) ("[I]f the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action.")) (other citations omitted). Thus, where a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, "the first element of the tort claim fails." *Silvestro v. Bank of Am., N.A.*, No. 3-13-0066, 2013 WL 1149301, at \*4 (M.D. Tenn. Mar. 19, 2013).

### 1. Negligence and Gross Negligence Claims against Vanderbilt

Plaintiff brings claims of negligence and gross negligence against Vanderbilt. (Doc. No. 35 ¶¶ 121-125, 131-137). In the Second Amended Complaint, Plaintiff alleges that Vanderbilt had a duty of care to conduct the Sexual Misconduct Policy disciplinary process "in a responsible way" and "failed to perform the duty of care by failing to provide a fair, impartial disciplinary process." (*Id*. at ¶¶ 122, 124). Plaintiff further alleges Vanderbilt was grossly negligent because it consciously disregarded a substantial and unjustifiable risk of injury or damage to Plaintiff. (*Id*. at ¶ 135).

42

Plaintiff does not allege that Vanderbilt owed him a duty in addition to the obligations set forth in the Handbook and Sexual Misconduct Policy. Moreover, the Handbook and Sexual Misconduct Policy reflect that they are the source of Vanderbilt's obligations to Plaintiff relevant to this case. (*See* Doc. No. 40-1 at 1-2 (Handbook explaining that the policies and regulations set forth therein will govern students)). Because Plaintiff has not identified a source of duty outside the relationship established by the Handbook and Sexual Misconduct Policy, his negligence and gross negligence claims are an impermissible attempt to recast his contractual claims in the language of tort. These claims will therefore be dismissed. *See, e.g., Silvestro*, 2013 WL 1149301, at *4 (dismissing negligence claims because plaintiff had not identified duty outside of contractual relationship); *Univ. of Dayton*, 438 F. App'x at 387 (under similar Ohio law, affirming dismissal of student's negligence claims because university's alleged duties arose from contractual obligations embodied in Honor Code and the tort claims mirrored the bases of student's breach of contract claim); *Pierre*, 2017 WL 1134510, at *9 (under similar Ohio law, holding that student failed to state a negligence claim against university because he was "trying to use a negligence claim as another means to assert his contract claims").

### 2. Gross Negligence Claims against Defendant Bell and Defendant Solomon

Plaintiff also brings claims of gross negligence against Defendant Cara Tuttle Bell, Director of Project Safe, and Defendant Mary Helen Solomon, Director of the Office of Student Accountability. (Doc. No. 35 ¶¶ 132-137). These claims fail because Plaintiff has failed to establish the basic elements of a negligence claim against either of these defendants.

The Second Amended Complaint alleges Defendant Bell encouraged Jane Roe to file a Title IX Complaint. (*Id.* at ¶ 10). As to Defendant Solomon, the Second Amended Complaint alleges that she threatened to call the police when Plaintiff informed her that he was suicidal,

prevented the hospital from notifying Plaintiff's next of kin, and provided the hospital with Plaintiff's educational records. (*Id*. at ¶¶ 52-53, 55, 58). Plaintiff further alleges Defendants Bell and Solomon "acted willfully, intentionally, and recklessly" and that their actions "were taken with such disregard for the rights of Plaintiff that a conscious indifference to consequences is implied in law." (*Id.* at ¶¶ 135, 133).

Plaintiff has failed to plead that Defendant Bell or Defendant Solomon owed any specific duty to him or breached a duty owed to him. Nor has Plaintiff alleged facts to show that their conduct was the proximate cause of his claimed injuries. Plaintiff's failure to allege sufficient facts to make out a prima facie case for negligence is fatal to his gross negligence claims against Defendant Bell and Defendant Solomon. These claims will therefore be dismissed.

### H.  Negligent Infliction of Emotional Distress

"In Tennessee, [negligent infliction of emotional distress] requires that the plaintiff establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation." *Finley v. Kelly*, 384 F. Supp. 3d 898, 914 (M.D. Tenn. 2019) (quoting *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004)). In addition, a plaintiff must "establish a 'serious' or 'severe' emotional injury," which is "one that occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id*. (quoting *Marla H. v. Knox Cty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011)).

Here, Plaintiff alleges that (1) Vanderbilt owed him "a duty of care"; (2) Vanderbilt "failed to perform the duty of care owed"; (3) "[a]s a direct and proximate result of Defendant's actions, Plaintiff Doe suffered actual harm in that he became suicidal"; (4) and that "Plaintiff suffered emotional harm, in addition to other damages." (Doc. No. 35 ¶¶ 126-130). This is nothing more

44

than "a formulaic recitation of the elements of a cause of action" for the negligent infliction of emotional distress and "will not do." *Twombly*, 550 U.S. at 557. Regardless, "in the elements that must be established for a claim of negligent infliction of emotional distress, the requirement that the stimulus conduct be extreme and outrageous is interwoven with the 'reasonable person' component of the element of serious or severe emotional injury." *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 706 (Tenn. Ct. App. 2012). "In effect, the plaintiff must prove that the conduct giving rise to his claim was so extreme and outrageous that it would have caused a reasonable person to suffer serious or severe emotional injury." *Id*. For reasons already stated in relation to the intentional infliction of emotional distress claims, the conduct about which Plaintiff complains does not rise to that level.

## I. Negligent Training and Supervision of Employees

Plaintiff also brings a claim against Vanderbilt for negligent training and supervision. (Doc. No. 35 ¶¶ 138-146). Under Tennessee law, a negligent training or supervision claim may be maintained by establishing the elements of a negligence claim, plus the additional element that the employer had knowledge of the employee's unfitness for the job. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 755 (6th Cir. 2014) (citing *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)); *Billiter v. SP Plus Corp.*, 329 F. Supp. 3d 459, 474 (M.D. Tenn. 2018).

This count of the Second Amended Complaint appears to focus solely on Damian Marshall, Vanderbilt's Title IX Compliance Manager at the time of Plaintiff's disciplinary process. (Doc. No. 35 ¶¶ 139, 94; Doc. No. 40-1 at 106). Plaintiff alleges that Marshall "lacked the proper training to carry out his / her responsibilities pursuant to Title IX, the Clery Act, and Vanderbilt University's sexual misconduct policy, as evidenced by her failure to correct the glaring lack of

fairness and due process in the EAD investigation at issue" and "committed negligence, grossly negligent, and intentional tortious acts that caused injury to Plaintiff." (Doc. No. 35 at ¶¶ 141, 143). As discussed above, Plaintiff has failed to establish the basic elements of a negligence claim. Even when he frames the purported breach in terms of Marshall specifically, rather than Vanderbilt as an institution, Plaintiff still has not alleged a source of duty that Marshall owed to Plaintiff outside the contractual relationship established by the Student Handbook and Sexual Misconduct Policy. Plaintiff's claim for negligent training and supervision will therefore be dismissed.

## V.    CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 39) will be granted in its entirety and this case will be dismissed.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE